## ELDRIDGE v. TERRY & TENCH CO.

(Supreme Court, Appellate Division, Second Department.　June 9, 1911.)

1. EVIDENCE (§ 77*)—PRESUMPTIONS—FAILURE TO CALL WITNESSES IN GENERAL.

Where a plaintiff has made out a prima facie case, his failure to call a particular witness who has knowledge of the case raises no presumption against him, and, if he has not made out a prima facie case, the failure of the defendant to call that witness raises no presumption against the defendant.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 97; Dec. Dig. § 77.*]

2. EVIDENCE (§ 87*)—PRESUMPTIONS—FAILURE TO CALL WITNESSES—EFFECT.

The presumption arising from the failure to produce a witness under one's control who has knowledge of the case does not supply an entire lack of proof on the part of the opposing party, but goes only to corroborate his prima facie case already made.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 109; Dec. Dig. § 87.*]

3. MASTER AND SERVANT (§ 286*)—ACTIONS—QUESTION FOR JURY.

In an action against a master, evidence held not to raise a jury question as to the reasonable safety of a walkway or runway, either as a scaffold within the meaning of the labor law or in any other light.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

Appeal from Trial Term, Kings County.

Action by Rose Eldridge, administratrix of Albert Eldridge, deceased, against the Terry & Tench Company. From a judgment for plaintiff and an order denying a motion for new trial, defendant appeals. Reversed and remanded.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

E. Clyde Sherwood, for appellant.

John F. McIntyre (David C. Hirsch, on the brief), for respondent.

PER CURIAM. The defendant appeals from a judgment in favor of the plaintiff for the sum of $12,947.25 entered upon a verdict of the jury in an action brought to recover damages for the death of the plaintiff's intestate through the alleged negligence of the defendant while said intestate was a workman in its employment. The plaintiff's claim as to the defendant's liability rested upon the provisions of the labor law in relation to the duty therein imposed upon a master to supply a reasonably safe scaffold for the use of the servant under the particular circumstances of this case. The defendant company had the contract of building the ironwork of the Manhattan Bridge from the anchorage on the Manhattan side to the anchorage on the Brooklyn side. The decedent was in its employment as a structural ironworker for several months prior to the accident. During the progress of the work of building the span, a heavy temporary flooring of pine timbers had been laid across, along, and upon the iron girders which formed the lower part of the span. At the time of the accident, the work of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

putting the iron into place had been practically completed, and some of the defendant's men were engaged in "cleaning up." As a part of this process, the temporary flooring of heavy pine timber was being taken up, and the planks so removed were carried to a part of the span between the anchorage and tower on the Manhattan side, where they were lowered to the ground beneath by means of a sling and fall operated by a steam engine. In taking up the temporary flooring, a continuous "walkway" or "runway," as it is variously described, was left undisturbed. This "walkway" was of the width of three or four planks, each from eight to twelve inches wide, and three inches thick. None of these planks was lashed or bolted to the structure beneath. The purpose of this "walkway" was to furnish a path across the span for the workmen. The lower ironwork of the span was constructed in "panels," numbered consecutively, and the place of the accident was at what is called the fourth panel on the Manhattan side, between the tower and the anchorage. To this place the flooring planks were brought from various parts of the span. The process of lowering them to the ground was as follows: Two of the planks, used as skids, were laid crosswise. Upon them were piled laterally four or five planks. These were bound together with ropes inserted in the space under the bottom of the pile. By means of the steam engine, the load of planks was lifted, and then was guided by two men to an open space in the panel through which it was lowered down through the air to the ground. While the decedent was at this work in company with a workman named Aldon, a load of planks had been lifted by the steam engine and guided to the open space for lowering. As it hung in the air, it struck against a part of the ironwork of the structure and swung towards the decedent Eldridge. He stepped or jumped back hurriedly to avoid the danger of the swinging mass. In doing so, he stepped or descended upon a plank, which tipped upright under his weight, and he fell to the ground beneath, some 135 feet, the plank following him down. His death resulted.

The plaintiff's theory at the trial was that the plank which tipped upright under the decedent's weight was a part of the "walkway" or "runway," and that the "walkway" was a scaffold in the meaning of the provisions of the labor law. The court sent the case to the jury on the theory that under the proofs the jury might find that the plank which tilted was a part of the "walkway," and, if so, they might find, further, that the "walkway," being in law a scaffold, was not constructed by the defendant with the care required by the provisions of the labor law (Consol. Laws 1909, c. 31). The jury having found for the plaintiff, the defendant attacks the judgment on two grounds, as follows: (a) The absence of any proof that the plank which tipped was a part of the "walkway" or "runway"; (b) an alleged error of law on the part of the trial court in holding that the "walkway" was a scaffold in the meaning of the labor law.

The proof as to the plank which tilted under the weight of the decedent was described in the charge of the learned trial court as "meager." Although there were two workmen at the very spot of the accident who could tell, necessarily, something about this plank, neither

of them were called as witnesses. The only witnesses produced by either party as to the happening of the accident were two workmen who were engaged from 75 to 100 feet away, and they were called by the plaintiff. Neither of these witnesses could tell anything positively or definitely as to the plank in question, except that it tilted upright under the weight of the decedent and looked "brand new" or "bright yellow." Whether this plank was part of the "walkway," or was a plank used as a skid, or was a plank lying around to be subsequently lowered, was left to be ascertained by the jury by a process of elimination; the trial court charging the jury that, unless it was an actual part of the "runway," the verdict must be for the defendant. The flooring of the "runway" consisted of heavy planks laid lengthwise, east to west, forming a temporary deck for the bridge. These planks were not all of the same length. Where the planks butted together, cross-planks were laid underneath at various spaces to support the ends of the shorter planks. It was the theory of the plaintiff that the decedent must have stepped or jumped upon either an unsupported end of a plank running east or west in the runway, or upon the projecting end of one of the supporting planks laid underneath from north to south. All the witnesses describe these planks as varying in width from eight to twelve inches, and the runway itself was described as being three or four planks in width. The plaintiff's process of elimination was as follows: (a) It was not one of the planks used as skids, for, according to the proofs, none of the skids projected across the runway into the space through which the lowering was done. Therefore it is argued that, had the decedent in stepping or jumping backward descended upon a skid, it could not have tilted upwards under him, as it rested upon the runway. (b) It was not one of the planks brought to the spot in question to be lowered, because the pile being lowered was the last pile there, and there were no planks left, or, in any event, the surplus planks, if any, were piled a little south of the runway, and not on the runway itself. One of the plaintiff's witnesses testified that the plank which tilted came up from the place of the runway, but both of them declared that they did not know whether it had been lying there lengthwise or crosswise. The decedent did not fall into the space in which the lowering down was done, but into another space, there being numerous open spaces about, or into a space caused by the tilting of the plank itself. Yet, as the plank was not wider than from eight to twelve inches, such a plank, running lengthwise from east to west, if tilted upright, would make ordinarily an open space of from eight to twelve inches, through which it is difficult to conceive an adult man falling through entirely in the manner described by the witnesses. If the plank which tilted under the decedent was one which had been laid crosswise underneath as a support for those laid lengthwise on top, then its tilting would necessarily lift up and throw out of position the heavy planks of the runway resting upon it, thus rendering it quite improbable, if not impossible, that it should tilt entirely upright before falling to the ground. The disagreement between two witnesses, viewing the occurrence from the same place of view, as to whether the plank tilted east or west, or north or south, helps to

make obscure any attempt to identify the location of the plank when it tilted. The inferences which may be drawn legitimately from the meager proofs are so uncertain in character as not to rise above speculation or guesswork. As before stated, there were two men engaged with the decedent at work at the very spot and time of the accident. Neither was called to give testimony as to the happening. On this appeal, the learned counsel for both parties insist that a presumption arises against the other because of this circumstance. One of these workmen was in court at the time of the trial. He was called as a witness by the defendant, but was withdrawn from the stand before giving testimony. The defendant contends that, as the witness was thus available to the plaintiff, she should have called upon him to testify, and, failing to do so, a presumption arises that his evidence would have been unfavorable. The defendant did not ask the trial court to so instruct the jury, nor was there any instruction given either way as to the failure of either party to produce testimony from this witness.

[1] If the plaintiff had made out a prima facie case, the failure to produce testimony from this particular witness would raise no presumption against her. Baldwin v. Brooklyn Heights R. Co., 99 App. Div. 496, 91 N. Y. Supp. 59. Likewise, if the plaintiff had failed to make out a prima facie case, then no obligation rested upon the defendant to produce the testimony of this witness, and no unfavorable presumption can arise against the defendant.

[2] The presumption which arises from a failure to produce a witness under one's control who is shown to have knowledge of the circumstances of a material question does not supply an entire lack of proof on the part of the opposing party, but goes only to corroborate proof already given which constitutes a prima facie case. Bleecker v. Johnston, 69 N. Y. 309.

[3] We are of opinion that the proofs taken at the trial were not sufficient to raise a question for the jury as to the reasonable safety of the "walkway" or "runway," viewing it as a scaffold within the meaning of the labor law, or in whatever light it may be viewed.

The judgment and order should be reversed and a new trial granted, costs to abide the event.