## ALVIN MEYER *v.* EDMOND J. McDONNELL

[No. 52, September Term, 1978.]

*Decided November 2, 1978.*

The cause was argued before GILBERT, C. J., and MORTON and THOMPSON, JJ.

*Peter Parker,* with whom was *Gordon W. Priest, Jr.,* on the brief, for appellant.

*Alva P. Weaver, III,* with whom were *Lord, Whip, Coughlan & Green, P.A.* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Alvin Meyer, hereinafter called appellant, filed suit against Edmond J. McDonnell, M.D., the appellee, in Baltimore City Court, alleging that as the result of an orthopedic operation upon his back he suffered sexual impotency and a lack of bowel and bladder control. We are obliged to reverse the judgment rendered in favor of Dr. McDonnell because the trial judge instructed the jury that evidence of Dr. McDonnell's tampering with the appellant's witnesses was admissible only for the purpose of raising an inference that the testimony of the witnesses would be unfavorable to Dr. McDonnell, and not as substantive evidence to support Mr. Meyer's claim. Although the trial judge was mild in his characterization of Dr. McDonnell's conduct during the trial, in our view that conduct was outrageous.[1] Whatever merit the medical profession may have in its current outcry against malpractice suits, the remedy does not lie in polluting the streams of justice by tampering with witnesses.

The record shows that on Friday, May 13, 1977, the fourth day of trial, appellee directed his secretary to call Dr. Robert P. Keyser, of Miami, Florida, an acquaintance and a fellow member of the American Scoliosis Society, and tell him that

---

1. Our view of such conduct is shared by others. *See,* L'Orange v. Medical Protective Co., 394 F. 2d 57 (6th Cir. 1968); Konrad v. DeLong, 57 F.R.D. 123 (N.D. Ill. 1972); Agnew v. Parks, 172 Cal. App.2d 756, 343 P. 2d 118 (1959); Bernstein v. Alameda-Contra Costa Medical Association, 139 Cal. App.2d 241, 293 P. 2d 862 (1956); Steiginga v. Thron, 30 N.J. Super. 423, 105 A. 2d 10 (1954).

Dr. Robert B. Nystrom was scheduled to testify against appellee and that his testimony would be transcribed and disseminated to Dr. Nystrom's local medical society in Miami and to the American Academy of Orthopedic Surgeons. The secretary immediately carried out such a call, and Dr. Keyser replied that he wanted to relay this information to Dr. Nystrom. This reaction was what appellee had expected and intended. Appellee's secretary then requested that Dr. Keyser do so before Dr. Nystrom testified, and gave him the phone numbers of both trial counsels and the trial judge. Just before noon on that same day, Dr. Keyser telephoned Dr. Nystrom, who was in the City Bar Library awaiting commencement of his testimony. Dr. Keyser, who was a mentor of Dr. Nystrom and a man whom Dr. Nystrom admired and respected, related the information about dissemination of testimony, and, with the preface that "this is not a threat, but," admonished him to tread lightly. In retrospect, Dr. Keyser considers his involvement inadvisable.

Dr. Nystrom was intimidated by the communication and felt that he would be unable to testify with a normal degree of candor. The trial judge, in ruling that testimony of the transaction was admissible and that a mistrial would be declared in the event that plaintiff could not promptly locate another standard of care witness, found specifically that the message was clearly intimidating and intended by appellee to be so.[2]

---

2. In his brief Dr. McDonnell argues that he, Dr. McDonnell, was anxious for the full facts to be brought out as soon as the trial judge indicated that his conduct had been improper. After testifying concerning the indirect contact with Dr. Nystrom he was questioned about his contacting Dr. Langfitt concerning Dr. Francis J. Pizzi, another important witness:

"Mr. Parker: How about Dr. Langfitt, did somebody call him?
"The Witness: No one in my office called Dr. Langfitt.
"The Court: All right."

But later, Dr. McDonnell testified:

"What I know about it, is that I read Dr. Pizzi's deposition, and was quite upset about the statement he made about Baltimore physicians, and then Dr. Pizzi was on the stand on Thursday, and he repeated those statements. And when I left here Thursday evening, I had some emergency surgery scheduled. But when I finished that, I went and called Dr. Finney and said, in his testimony today, Dr. Pizzi, who had trained in Philadelphia, his

On Thursday, May 12, 1977, appellee telephoned his friend and colleague, Dr. William H. M. Finney, a Baltimore neurosurgeon. He asked Dr. Finney to call Dr. Thomas H. Langfitt, former Chief of Neurosurgery at the University of Pennsylvania, and a long-time friend of Dr. Finney, and advise him that Dr. Francis J. Pizzi was scheduled to testify against appellee and that his testimony would be transcribed and disseminated to his local medical society in Trenton, New Jersey. Dr. Finney made such a call that same evening, advising Dr. Langfitt that Dr. Pizzi was in the process of testifying against appellee, that the testimony would be disseminated, and that it might not be a particularly good thing for Dr. Pizzi to testify in an out of state medical malpractice trial with an impending appearance before the American Board of Neurological Surgery for the oral portion of his certification examinations.[3]

Dr. Langfitt attempted to call Dr. Pizzi at the outset of his testimony on May 12 or 13, but was unsuccessful. On Saturday morning, May 14, he reached Dr. Pizzi by telephone at his home and relayed the information conveyed by Dr. Finney, including the admonition as to the impending oral Board examinations. Dr. Langfitt was the person responsible for bringing Dr. Pizzi into neurosurgery. He also trained Dr. Pizzi who characterized him as "very important to me," and a person whom he admired and respected. Dr. Pizzi expressed to Dr. Langfitt that he was fearful that he might now be blackballed by the Board as a result of false information

testimony today was such as incensed me, and I wanted him to know that he had said that no Baltimore physician had given this man an adequate examination. Also, I asked Dr. Finney if he knew Dr. Langfitt, and he said, yes, he did. Then I said, 'I would like, if you would, tell Dr. Langfitt, or have Dr. Langfitt tell Dr. Pizzi, I don't mind that his testimony in Baltimore is going to be transcribed,' and I asked Mr. Weaver before Dr. Pizzi started to testify, to have his transcript, so I would have it, and that it would be sent to Philadelphia and to New Jersey, where he was from, and this I did, because I was incensed at Dr. Pizzi's remarks about Baltimore physicians, and I wanted it to go back. I never intended Dr. Pizzi not to testify. He was already testifying, and I had no intention of stopping him from testifying, interfering or threatening him."

3. Dr. McDonnell denied knowing anything about the impending oral examinations.

which may have been spread about him as a "violator of the
conspiracy of silence," but that his evaluation of the case was
objectively correct and that he felt committed to give an
honest opinion in testimony. Dr. Langfitt told him to let his
conscience be his guide with regard to continuing his
testimony, but that they would have to "sit down and talk
about a few things afterward." This communication had the
calculated effect on Dr. Pizzi. He testified that as a result of
his conversation with Dr. Langfitt he was so upset that he
was forced to cancel his plans to attend the commemoration
of his father's fifty years in the practice of medicine.

With respect to the evidence adduced concerning appellee's
tampering with the witnesses, the trial judge included in his
instructions the following:

> "Now, if you find that either the plaintiff or the
> defendant or both tried to intimidate any of the other
> witnesses, an inference would arise that the
> testimony of such witness would be unfavorable to
> the case of the one who so tried to intimidate. [4]
> However, such inference, if indeed you do find one
> to exist, does not amount to substantive proof and
> it can't take the place of proof of a fact necessary
> to the other party's case." [5]

Appellant argues, based on cases collected in Annot., 38
A.L.R. 595 (1925), that the trial judge should have instructed
the jury that such evidence could be considered by them "as
tending to show that defendant is unwilling to rely on the
truth of his cause, or is conscious that his case is weak or
unjust, or that his own evidence is dishonest" and that the
trial judge erred in merely instructing the jury "that the

---

4. There was some slight evidence of misconduct on the part of the
appellant. The effect of that conduct is not before us in this appeal.

5. At the appropriate time the appellant's counsel made an objection which
included the following:

> "Mr. Parker: Now, as to these other items, Your Honor, we except
> to the fact that you do not give a positive
> charge relating to admission by conduct."

Appellee's argument that the objection was not properly preserved for
appeal is not well taken.

testimony of such witness would be unfavorable to the case of the one who so tried to intimidate." He also argues, based on cases cited in 29 Am. Jur.2d § 277 and § 627, that the instruction should include advice to the jury that such an attempt to intimidate or influence a witness is an admission by conduct and constitutes affirmative evidence. Appellee argues that an attempt to keep a witness from testifying cannot be considered as substantive evidence. He particularly relies on *Maszczenski v. Myers,* 212 Md. 346, 129 A. 2d 109 (1957), in which the Court said:

> "Although an inference arises from the suppression of evidence by a litigant that this evidence would be unfavorable to his cause, *Love v. Dilley,* 64 Md. 238, 1 A. 59, 4 A. 290; *Love v. Dilley,* 64 Md. 610, 6 A. 168; 20 *Am. Jur., Evidence,* Sec. 185, it is well settled that this inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case. *Eldridge v. Terry & Tench Co.,* 145 App. Div. 560, 129 N.Y.S. 865; *Rosenthal v. Ostrow,* 287 Pa. 87, 134 A. 384; *Stocker v. Boston & M.R.R.,* 84 N. H. 377, 151 A. 457, 70 A.L.R. 1320; *Northern Ins. Co. of N.Y. v. Fischer* (D. C. Mun. Ct. App.), 103 A.2d 581; *F.R. Patch Mfg. Co. v. Protection Lodge, No. 215, I.A.M.,* 77 Vt. 294, 60 A. 74; *The Luckenbach* (D.C. Va.), 144 F. 980; *Welsh v. Gibbons,* 211 S. C. 516, 46 S.E.2d 147, 151; *Wigmore on Evidence,* 3rd ed., Vol. II, Sec. 290, p. 179, and *ibid.,* Vol. IX, Sec. 2524, p. 441." *Id.* at 355.

We have examined carefully the opinion of the Court of Appeals in *Maszczenski,* and the authorities cited therein, and find that it does not control the issue in this case. The focus of discussion in *Maszczenski,* and in the cases and text material upon which the Court there relied, was the nature and effect of the inference to be drawn when important direct evidence is not produced. In such cases it is generally held that an inference may be drawn that the missing evidence would have been unfavorable to the party who could have produced it. The references in *Maszczenski* to Professor Wigmore's treatise on evidence are to sections dealing with

the nature and effect of the inferences to be drawn from missing evidence. In 9 *Wigmore on Evidence* § 2524 (3d ed. 1940), it is stated:

> "The opponent's spoliation or suppression of evidential facts (*ante*, § 278), and particularly of a document (*ante*, § 291), has always been conceded to be a circumstance against him, and in the case of a document, to be some evidence that its contents are as alleged by the first party. But that a rule of presumption can be predicated is doubtful."

The discussion in 2 Wigmore, *supra*, § 290, also cited in *Maszczenski*, deals with the distinction between a mere failure to produce specific evidence and fraudulent conduct aimed at suppressing or spoliating evidence. There also appears a discussion of the relationship between permissible inferences drawn from missing evidence and the burden of persuading the jury. It is pointed out that the party who does not bear the burden of proof need not produce any evidence at all, at least until his opponent has produced sufficient affirmative evidence to shift the burden of going forward with the evidence. This discussion provides a clear basis for the holding in *Maszczenski*, and many other cases, that no inferences may be drawn from a defendant's failure to produce evidence until the plaintiff has made out at least a *prima facie* case. *See, e.g., Conlin v. Greyhound Lines, Inc.,* R. I., 384 A. 2d 1057, 1060 (1978); *Lapierre v. Greenwood,* 85 R. I. 484, 133 A. 2d 126 (1957).

A more recent decision of the Court of Appeals reaffirms the holding in *Maszczenski*. In *Larsen v. Romeo,* 254 Md. 220, 255 A. 2d 387 (1969), a question arose concerning the nature and effect of an inference to be drawn concerning a missing piece of physical evidence. The only relevant point, for our purposes, was whether the disposal of an air hose by the defendant, where he claimed that his air brakes had failed unexpectedly, would raise an inference sufficient to discredit his testimony. The Court said:

> "As a general rule, an inference arises from the suppression or destruction of evidence by a litigant

that such evidence would be unfavorable to his case. However, this inference does not amount to substantive proof and can not take the place of proof of a fact necessary to the other party's case. *Maszczenski v. Myers,* 212 Md. 346, 129 A. 2d 109. Romeo testified that he or a mechanic took a piece of hose off his tractor, that he showed the mechanic that it had a leak, and then threw the hose away. Assuming, without deciding, that Romeo destroyed this piece of hose, the only inference that may be drawn is that that particular piece of hose, which may or may not have been part of the brake system, was not defective. Such an inference does not negate Romeo's testimony that his brakes failed." *Id.* at 228.

In both *Larsen* and *Maszczenski, supra,* the broad issue was whether the inferences to be drawn from the missing evidence would be sufficient to help get the plaintiff's case to the jury. In the present case we are not dealing with inferences to be drawn concerning missing evidence. Although appellee attempted to intimidate the witnesses their testimony was received and placed before the jury. It was not necessary to make the inference that that testimony would have been unfavorable to the appellee because the testimony was actually produced. Nor are we concerned with whether any inferences drawn from the attempt to intimidate witnesses would be sufficient to establish a *prima facie* case. Here there is no question that appellant made out a *prima facie* case for recovery wholly apart from the evidence now in question. Our concern is with the inferences which may be drawn from appellee's conduct.

Several authorities have recognized that conduct such as that involved here may constitute an admission on the part of the actor that he is conscious of the weakness of his case and that he is unwilling to rely on the fair and proper means of arriving at the truth.

Professor Wigmore, in the same edition cited by the Court of Appeals in *Maszczenski, supra,* states the relevant proposition as follows:

"It has always been understood—the inference, indeed, is one of the simplest in human experience —that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause." 2 *Wigmore on Evidence* § 278 at 120 (3d ed. 1940) (emphasis in original).

McCormick has also recognized this principle in his work:

"As might be expected, wrongdoing by the party in connection with his case, amounting to an obstruction of justice is also commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means. Accordingly, a party's false statement about the matter in litigation, whether before suit or on the stand, his fabrication of false documents, his undue pressure, by bribery or intimidation or other means, to influence a witness to testify for him or to avoid testifying, his destruction or concealment of relevant documents or objects, his attempt to corrupt the jury, his hiding or transferring property in anticipation of judgment—all these are instances of this type of admission by conduct." Mc-Cormick, *Evidence* § 273 (2d ed. 1972).

The principle outlined by Wigmore, *supra,* and McCormick, *supra,* has been recognized in several cases from other

jurisdictions. *See, e.g., Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F. 2d 594 (3d Cir. 1968), *cert. denied,* 393 U. S. 954; *Great American Insurance Co. v. Horab,* 309 F. 2d 262 (8th Cir. 1962); *New York Life Insurance Co. v. Bacalis,* 94 F. 2d 200 (5th Cir. 1938); *Lone Ranger, Inc. v. Currey,* 79 F. Supp. 190 (M.D. Pa. 1948); *Minihan v. Boston Elevated Ry. Co.,* 205 Mass. 402, 91 N. E. 414 (1910); *McHugh v. McHugh,* 186 Pa. 197, 40 A. 410 (1898). *See also,* Maguire and Vincent, *Admissions Implied from Spoliation or Related Conduct,* 45 Yale L.J. 226 (1935).

The same basic principle has been recognized and applied by this Court in the context of criminal cases. *See Sewell v. State,* 34 Md. App. 691, 368 A. 2d 1111 (1977) (holding that the flight of the accused as well as his destruction of certain evidence could be considered by the jury as showing his consciousness of guilt); *Saunders v. State,* 28 Md. App. 455, 346 A. 2d 448 (1975) (recognizing that "an attempt by an accused to suborn a witness is relevant and may be introduced as an admission by conduct, tending to show his guilt," but holding that the efforts by a third person to tamper with the witness were not sufficiently connected to the defendant to make them admissible).

Under the view taken by Wigmore, McCormick, and the cases cited above, which view we here adopt, the conduct of appellee in attempting to intimidate Doctors Nystrom and Pizzi is admissible as tending to show his consciousness of the weakness of his case and a belief that his defense would not prevail without the aid of such improper and unfair tactics as those in which he engaged. This, in conjunction with the other evidence in the case, may lead to the further inference that appellee considers his case to be weak because he, in fact, is guilty of the negligence which appellant asserts he committed. Such inferences are, of course, merely permissible and the jury is free to either accept or reject them as it sees fit.

In light of the foregoing discussion it is clear that the trial court's instruction in the instant case was too confining. Under that instruction the jury properly could not have considered the corroborative effect of the evidence of

attempted intimidation. Such evidence may not be sufficient to establish a *prima facie* case but that is not an issue which we need to decide here. Rather, our holding is that the evidence in question had probative value insofar as it related to the appellee's consciousness of the weakness of his case and it could have been considered by the jury for that purpose. There was evidence that the operation caused the appellant's complaints. There was also evidence that the appellant's complaints were not true and that in any event they were not caused by the operation. We cannot say that the evidence of the doctor's misconduct in attempting to influence witnesses for the opposition would not have turned the scales of justice in the jury's mind if they had been properly instructed on the question. We therefore reverse.

The appellant also complains because the trial judge refused to permit him to present in rebuttal the complete testimony of Ki Ho Kim, M.D. He first ruled that the testimony was not proper rebuttal and secondly that in view of the late hour in which the appellant notified the appellee of his intention to use Dr. Kim as an expert witness that he would not, in the exercise of his discretion, permit the testimony of Dr. Kim. We see no need to rule as to this question on appeal because on retrial the witness will not be a surprise witness and it seems most unlikely that the appellant would wait until rebuttal to offer the witness in view of the trial judge's ruling.

Finally, the appellant argues that the trial judge violated his privilege of not disclosing communications relating to diagnoses or treatment for his prior mental or emotional disorder. We see no error. The statute, *Md. Code,* Cts. & Jud. Proc. § 9-109, provides that the privilege shall not apply when the patient introduces his medical condition as an element of his claim or defense. Appellant claimed damages for his mental or emotional disorders in his declaration, in testimony, and in his request for instructions.

*Judgment reversed.*
*Case remanded for a new trial.*
*Appellee to pay costs.*