467 A.2d 1072

## COMMISSION ON MEDICAL DISCIPLINE

v.

## Edmond J. McDONNELL.

## No. 1921, Sept. Term, 1982.

Court of Special Appeals of Maryland.

Nov. 14, 1983.

Certiorari Granted April 5, 1984.

392

Susan K. Gauvey, Asst. Atty. Gen., with whom was Stephen H. Sachs, Atty. Gen., of Maryland on brief, for appellant.

Shale D. Stiller, Baltimore, with whom were Frank, Bernstein, Conaway & Goldman, Baltimore, on brief, for appellee.

Argued before LOWE, WEANT and BLOOM, JJ.

BLOOM, Judge.

The Commission on Medical Discipline (Commission), appellant, found Dr. Edmond J. McDonnell, appellee, guilty of a violation of Md.Ann.Code Art. 43, § 130(h)(8), "immoral conduct of a physician in his practice as a physician," and issued a reprimand. Dr. McDonnell appealed that decision to the Baltimore City Court (now part of the Circuit Court of Baltimore City) which reversed the Commission's decision, whereupon the Commission noted this appeal from the judgment of the Baltimore City Court.

The case had its origins in a medical malpractice suit brought against Dr. McDonnell in 1975 by a former patient, Alvin Meyer. Meyer claimed to be suffering from sexual

impotency and a lack of bowel and bladder control as a result of spinal surgery performed on him in 1972 by Dr. McDonnell, an orthopedic surgeon. After several delays, the case was assigned a "right of way" date of May 9, 1977, on the trial calendar. A few days prior to trial, counsel for Meyer notified McDonnell's attorney that Dr. Robert Nystrom of Coral Gables, Florida, an orthopedic surgeon, and Dr. Francis J. Pizzi of Trenton, New Jersey, a neurosurgeon, had just been engaged to testify as expert witnesses for the plaintiff. Dr. McDonnell's attorney immediately scheduled and took depositions of Drs. Nystrom and Pizzi on Friday, May 6, and Saturday, May 7, respectively. On Thursday, May 12, after the trial had been underway for three days, transcripts of those depositions were delivered to Dr. McDonnell's attorney who, at the first opportunity, reviewed them with his client.

Dr. McDonnell has practiced medicine in the Baltimore area for more than thirty-five years. He is an associate professor of orthopedic surgery at Johns Hopkins Medical School, medical director of Children's Hospital in Baltimore and past president of the Maryland Orthopedic Society. Apparently, he enjoys an enviable reputation among his peers in the medical profession. He was incensed that two young, relatively inexperienced physicians with limited knowledge of the specific surgical procedure [1] he had used on Mr. Meyer would undertake to act as "hired guns" and testify as expert witnesses against him without having examined the patient. Dr. McDonnell was also upset about what he perceived to be gross inaccuracies in their deposition testimony, and the fact that he was being sued for an amount far in excess of his malpractice insurance coverage was admittedly of considerable concern to him. He feared that jurors with limited educational backgrounds and no medical knowledge might be influenced by inaccurate or erroneous testimony from Drs. Nystrom and Pizzi.

---

1. Use of Harrington instrumentation for fixation of the spine.

If the identity of his opponent's expert witnesses had been disclosed earlier, Dr. McDonnell's trial counsel would have been able to get useful background information about them in advance of trial. Having had no opportunity to do so in this case, he discussed with his client the best means of obtaining such information as rapidly as possible, and Dr. McDonnell undertook to conduct an inquiry. With the express approval of his trial counsel, Dr. McDonnell also undertook to get messages through to Drs. Nystrom and Pizzi, before they testified, that transcripts of their testimony would be sent to their respective local medical societies and, as to Dr. Nystrom, to the American Academy of Orthopedic Surgeons.

In order that those messages would have their greatest impact, Dr. McDonnell felt that the messengers should be persons held in high esteem by Drs. Nystrom and Pizzi. Accordingly, Dr. McDonnell selected Dr. Robert Keyser of Miami, Florida, under whom Dr. Nystrom had received his training in orthopedic surgery, to contact Dr. Nystrom, and Dr. Thomas Langfitt of Philadelphia, Pennsylvania, under whom Dr. Pizzi had received his training in neurosurgery, to contact Dr. Pizzi.

Dr. McDonnell did not know Dr. Langfitt personally. He was aware that his friend, Dr. John Chambers, knew Langfitt but was unable to reach Dr. Chambers. Dr. William Finney, an associate of Dr. Chambers who also knew Dr. Langfitt quite well, volunteered to call Dr. Langfitt. Dr. Finney testified that Dr. McDonnell merely asked him to inquire about Dr. Pizzi's background and qualifications and to inform Dr. Langfitt, if he intended to call Dr. Pizzi, that it was a policy of Dr. McDonnell in cases of this nature to send a transcript of the incoming expert's testimony to that expert's local medical society. Dr. Finney called Dr. Langfitt that night and learned that Dr. Pizzi had completed his residency in neurosurgery about eighteen months earlier and had gone to Trenton to practice that specialty. He then informed Dr. Langfitt that Dr. Pizzi was coming to Baltimore to testify as an expert witness in the malpractice case

and that his testimony would be "disseminated" in accordance with Dr. McDonnell's policy. There was some discussion as to whether it was a particularly good thing for Dr. Pizzi to testify in an out-of-state medical malpractice case before he was even eligible for certification by the American Board of Neurological Surgery.[2]

Dr. Langfitt attempted to call Dr. Pizzi at the outset of his testimony but was unsuccessful. He reached Dr. Pizzi by telephone on Saturday, May 14, and relayed to him the information conveyed by Dr. Finney. The message, coming as it did from the person who had brought him into neurosurgery and trained him, a man whom he greatly respected and admired, upset Dr. Pizzi so much that he cancelled his plans to attend the commemoration of his father's fifty years in the practice of medicine because he felt he might inject a note of gloom into what should be a festive occasion. Particularly disturbing to Dr. Pizzi was his apprehension that his testimony might result in false information being spread about him as a "violator of the conspiracy of silence" which could keep him from obtaining Board certification.[3] Nevertheless, Dr. Pizzi, convinced that his proposed testimony was objectively correct, told Dr. Langfitt that he felt committed to give an honest opinion in testimony. Dr. Langfitt advised him to let his conscience be his guide but suggested that they would have to "sit down and talk about a few things afterward."

In the meantime, on Friday, May 13, Dr. McDonnell instructed his secretary to call Dr. Keyser in Miami and tell him Dr. Nystrom was scheduled to testify against Dr. McDonnell and that this testimony would be transcribed and disseminated to Dr. Nystrom's local medical society and the American Academy of Orthopedic Surgeons. The secretary

---

**2.** Eligibility requirements include two years of practice after completing residency, prior to taking an oral examination.

**3.** There is no indication that Dr. McDonnell knew anything about Dr. Pizzi's certification status, particularly his plan to take the oral examination in September.

made the call to Dr. Keyser who indicated that he would relay that information to Dr. Nystrom. Since Dr. Nystrom was then in Baltimore for the trial, Dr. Keyser was given the telephone numbers of both trial counsels and the trial judge.

Just before noon that same day, Dr. Keyser telephoned Dr. Nystrom and relayed to him the message from Dr. McDonnell's secretary, prefacing the information about the proposed dissemination of his testimony with "this is not a threat, but," and admonished him to "tread lightly." The message, delivered, as it was, by Dr. Nystrom's mentor and a man for whom Dr. Nystrom had the utmost respect and admiration, had a considerable impact. Dr. Nystrom was intimidated and felt that he would be unable to testify with a normal degree of candor.

The telephone call to Dr. Nystrom and its effect upon him were brought to the attention of the trial judge who then conducted an inquiry in chambers. Dr. McDonnell appeared to be surprised and dismayed to learn that his conduct in initiating the intimidating message to Dr. Nystrom was regarded by the court as reprehensible. He immediately telephoned Dr. Finney to tell him not to call Dr. Langfitt, but it was too late.

The court's offer to declare a mistrial if the plaintiff could not promptly locate another standard-of-care witness was declined, and the case continued with both Drs. Nystrom and Pizzi testifying. The jury found for Dr. McDonnell; Meyer appealed and this court, in *Meyer v. McDonnell,* 40 Md.App. 524, 392 A.2d 1129 (1978) reversed because of error in the instructions to the jury regarding what effect should be given to Dr. McDonnell's conduct in "tampering" with his opponent's expert witnesses.

It was apparently because of this court's characterization of Dr. McDonnell's conduct as "outrageous" that the Commission requested an opinion from the Attorney General as to its jurisdiction to consider possible disciplinary action against Dr. McDonnell and Dr. Finney. Responding to that

request, the Attorney General opined that, under Md.Ann. Code Art. 43, § 130(h)(8), the Commission did have jurisdiction to investigate and consider possible disciplinary action against Dr. McDonnell but not Dr. Finney. Charges were brought against Dr. McDonnell pursuant to that opinion and, after a hearing, Dr. McDonnell's conduct was found to be in violation of § 130(h)(8).

In reversing the Commission, the lower court held that although the Commission's findings of fact were supported by the evidence, its conclusions based upon those facts were erroneous as a matter of law. "The legal effect of evidence and the ultimate conclusions drawn by an administrative agency from the facts, as distinguished from its findings of primary or evidential facts, are questions of law for the reviewing court." *State Department of Assessments and Taxation v. Glick,* 47 Md.App. 150, 154, 422 A.2d 34 (1980), quoting 73A C.J.S. Public Administrative Bodies and Procedure § 228.

Specifically, the court held that the Commission reached erroneous legal conclusions in finding (1) that Dr. McDonnell's conduct was "immoral" within the meaning of the statute and (2) that such conduct occurred "in his practice as a physician."

■ Md.Ann.Code Art. 43, § 130(h), listing nineteen separately numbered causes[4] for which the Commission, after investigation and hearing, might reprimand a physician, place him on probation or revoke or suspend his license to practice medicine, was repealed in 1981 and, with some additional language derived from former Art. 43, § 130(b), is now Health Occupations Code Ann., § 14–504, which lists twenty-four separately numbered causes for which the Commission can discipline a physician. The new statute differs from the original primarily in form and arrangement with relatively minor variations in language apparently not in-

---

4. Actually, twenty-three, since subsection (h)(6) lists five separately enumerated causes.

tended to effect any substantive change. Art. 43, § 130(h)(8), listed as a ground for discipline "immoral conduct of a physician in his practice as a physician"; the new statute, in § 14–504(3) authorizes the Commission to reprimand a licensee, place him on probation or suspend or revoke his license if he "is guilty of immoral conduct in the practice of medicine." The Commission concedes that there is no substantive difference between "in his practice as a physician" and "in the practice of medicine." We shall treat the former as meaning the latter.

The appellee contended, and the lower court agreed, that in order for conduct to be immoral, it must be so inherently evil that one's conscience recognizes it as wrong or where community standards recognize it as wrong, relying upon the following definitions of "Immoral," "Immoral act or conduct," and "Moral law" in *Black's Law Dictionary* (5th ed. 1979):

IMMORAL. Contrary to good morals, inconsistent with the rules and principles of morality; inimical to public welfare according to the standards of a given community, as expressed in law or otherwise. Morally evil; impure; obscene; unprincipled; vicious; or dissolute.

IMMORAL ACT OR CONDUCT. Within rule authorizing disbarment of attorney is that conduct which is willful, flagrant, or shameless, and which shows a moral indifference to the opinions of the good and respectable members of the community.

MORAL LAW. The law of conscience; the aggregate of those rules and principles of ethics which relate to right and wrong conduct and prescribe the standards to which the actions of men should conform in their dealings with each other.

The court noted that the presiding judge in the *Meyer* case did not believe that Dr. McDonnell intended to do anything wrong or malicious. Based upon the evidence that Dr. McDonnell made no effort to conceal his conduct but, instead, acted with the approval of his trial counsel, the

court concluded that appellee was not consciously aware of wrongdoing. Then, referring to evidence before the Commission that not only Dr. McDonnell's counsel but several leaders in the medical community endorsed, rather than condemned, appellee's conduct, the court concluded that there was no evidence that such conduct was condemned by community standards. Having determined that the evidence before the Commission failed to show that Dr. McDonnell knew, believed or thought that he was doing a wrong, bad, evil or improper act or that his conduct was regarded as wrong, bad, evil or improper by community standards, the court held that the evidence simply failed to support a finding of immoral conduct.

We disagree with that holding of the lower court.

The Commission, which is composed of nine physician members and two consumer members, should be particularly able to gauge the effect that the telephone calls initiated by Dr. McDonnell would have upon the prospective expert witnesses for Meyer. It is true that the messages ultimately received by Drs. Nystrom and Pizzi may have been somewhat more threatening in tone than Dr. McDonnell intended to transmit. Nevertheless, the Commission, with its expertise, could certainly find that even the seemingly innocuous message that transcripts of their testimony would be forwarded to appropriate medical societies, delivered by the recipients' mentors, would naturally tend to intimidate Drs. Nystrom and Pizzi and constrict their testimony.

■ It may be inferred that a person intends the natural and probable consequences of his act. *State v. Gover,* 267 Md. 602, 608, 298 A.2d 378 (1973); *Davis v. State,* 204 Md. 44, 51, 102 A.2d 816 (1953); *James v. State,* 14 Md.App. 689, 694, 288 A.2d 644 (1972); *Lindsay v. State,* 8 Md.App. 100, 105, 258 A.2d 760 (1969); *Director of Public Prosecutions v. Beard,* [1920] A.C. 479, 12 A.L.R. 846, 858 (1920), quoting *Rex v. Meade,* [1909] 1 K.B. 895, 899: "A man is taken to intend the natural consequences of his acts."

In view of that permissible inference, despite the evidence relied upon by the lower court as tending to show no awareness of wrongdoing on the part of Dr. McDonnell, the Commission had sufficient evidence before it to support a finding that Dr. McDonnell initiated the telephone calls in question with the intention of intimidating witnesses in a lawsuit and constricting their testimony against him. Such conduct is clearly morally wrong. It amounts to an endeavor to obstruct justice. *See Romans v. State,* 178 Md. 588, 592, 16 A.2d 642 (1940), *cert. den.* 312 U.S. 695, 61 S.Ct. 732, 85 L.Ed. 1131 (1941). That is a crime involving moral turpitude. *See Maryland State Bar Ass'n v. Rosenberg,* 273 Md. 351, 329 A.2d 106 (1974).

We also disagree with the lower court holding that the Commission erred, as a matter of law, in finding that the asserted immoral conduct of Dr. McDonnell was committed "in his practice as a physician."

The court declined to hold that only those specific activities set forth in the definition of the term "practice of medicine" in Md.Ann.Code Art. 43, § 119(f) [now Md. Health Occupation Ann.Code, § 14–101(i) ] [5] come within the second prong, i.e., "practice as a physician" aspect of § 130(h)(8). It did hold, however, that "the censured conduct must be shown to have had a detrimental effect on the performance of such activities." We think that interpretation of the statutory language may be a bit too narrow.

Appellant, on the other hand, contends that "in his practice as a physician" should be construed to include acts done by a physician that might not occur directly in the course of,

---

**5.** To engage in medical diagnosis, healing, treatment or surgery, including diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual, by physical, mental, emotional or other process exercised or invoked by the practitioner, the patient, or both, or by appliance, test, drug, operation or treatment. It also includes the ending of a human pregnancy and performing acupuncture. It does not include selling any nonprescription drug or medicine, practicing as an optician or performing a massage or other manipulation entirely by hand.

or as a part of, medical care or treatment but that have a direct impact on present or former patients and are connected to a present or former physician-patient relationship. That interpretation, we believe, is much too broad.

█ We deem it unnecessary to attempt a definitive interpretation of the phrase "in the practice of his profession" or the current statutory language "in the practice of medicine." It is sufficient to hold, as we do, that in order to be punishable or censurable by the Commission the physician's misconduct need not be confined to his actions in diagnosing or treating a patient but must be directly related to some aspect of the practice of medicine.

If Dr. McDonnell's attempt to suppress or, at least, constrict evidence against him in a lawsuit had involved only his pocketbook, we might well have concluded that his ill-advised conduct was that of a litigant, not a physician. The evidence which Dr. McDonnell sought to affect, however, was medical expert witness testimony that he had failed to use adequate skill in treating a patient. Such evidence involved a risk of loss of more than money; at hazard, to some extent, was Dr. McDonnell's professional reputation,[6] of which he was justly proud.

█ Since the Commission is composed of physicians with some expertise in the matter, its interpretation of what constitutes or is included in "the practice of medicine" is entitled to some deference. We believe, therefore, that the Commission could legally conclude that a physician's attempt to protect and preserve his professional reputation is conduct "in his practice as a physician" because his future practice may well depend upon his reputation.

Appellee raised several constitutional issues which the lower court found it unnecessary to address. He contends

---

**6.** Also at some possible risk, perhaps, was appellee's license to practice, if the witnesses were to testify that his treatment of Meyer amounted to professional incompetency, which, under § 130(h)18 [now § 14–504(4)] constitutes grounds for revocation or suspension of a medical license.

that § 130(h)(8) is unconstitutionally vague because of a lack of adequate guidelines and unconstitutionally vague as applied in this case because it is not limited to appellee's fitness to practice medicine; that the Commission failed to promulgate rules and regulations and unconstitutionally applied vague statutory terms on an *ad hoc, ex post facto* basis; and that the multiple roles of the Attorney General's office as prosecutor and advisor to the Commission, including a predetermination of guilt in its advice to the Commission, deprived appellee of his due process rights.

We will not ordinarily decide any point or question which was not tried and decided by the lower court, but where a point or question of law was presented to the lower court and a decision thereof by this court is necessary or desirable for the guidance of the lower court or to avoid the expense and delay of another appeal, we may decide such point or question of law. Md.Rule 1085. Since all but one of the constitutional issues raised by appellee fall into that category, we shall here address them.

■ The first of those contentions was answered by the Court of Appeals in *Unnamed Physician v. Commission on Medical Discipline,* 285 Md. 1, 14–15, 400 A.2d 396 (1979):

We also conclude that § 130 is not void for vagueness. As we indicated initially, the statute informs a physician that if he engages in any of the activities forbidden by § 130(h) he will be subject to discipline and the possible loss of his license. This is plain language which can be understood by persons of ordinary intelligence. "That is all that is required of a statute in order to prevent it from being vague and indefinite in a constitutional sense." (citations omitted).

■ The assertion that § 130(h)(8) is unconstitutionally vague as applied to appellee because "immoral conduct" as a basis for censure was not limited to his fitness to practice medicine is without merit. A specific ground for discipline and possible revocation of a physician's license is conviction of a crime involving moral turpitude, § 130(h)(4) [now

§ 14–504(6)], which crime need have no bearing on the physician's fitness to practice medicine and, indeed, need not be related in any way to the practice of medicine. Under § 130(h)(8), it was necessary to show that the improper conduct was in the practice of medicine, not that it was such conduct as would reflect upon fitness to practice.

■ With respect to appellant's third constitutional contention, we do not believe that the statutory language is so vague as to require the promulgation of rules and regulations before the statute could be enforced. The physician is adequately informed, in plain language, of the type of conduct which will subject him to discipline, *Unnamed Physician v. Commission on Medical Discipline, supra;* it would be absurd to require the Commission to promulgate rules and regulations listing every conceivable act that would constitute "immoral conduct" within § 130(h)(8).

■ In arguing that the Attorney General's office predetermined his guilt in advising the Commission, appellee misinterprets a letter written by an assistant attorney general in response to an inquiry by the Chairman of the Commission. The Commission sought legal advice as to its jurisdiction to discipline Dr. McDonnell on the basis of his alleged conduct in the *Meyer* case. The reply made it clear that the Attorney General was not attempting to decide facts or make findings or reach conclusions. It stated that, on the basis of the evidence "as reported by the Court of Special Appeals," the Commission had jurisdiction "to investigate and consider possible disciplinary action against McDonnell, but not Finney."

Appellee's contention that he was deprived of a fair hearing because the Attorney General's office acted as prosecutor and as advisor to the Commission presents an issue which cannot be resolved on this appeal.

■ The dual role of the Attorney General as advisor to the Commission and prosecutor of cases before the Commission, as with almost all of the State's agencies, is mandated by the Maryland Constitution, Art. V, § 3, and by Md.Code

Ann. Art. 32A, §§ 2, 5(a). As counsel for the Commission on this appeal, the Attorney General asserts that because his office is required to act in both capacities, he separates the two roles by assigning certain assistants to serve as advisors and other assistants to act as prosecutors in adjudicatory hearings and by issuing guidelines to insure that each group of assistants is independent of the other. Depending upon the nature of those guidelines and the extent to which they were followed and depending also upon whether the Attorney General himself participated in any manner in these proceedings, such separation of functions may have been sufficient to avoid unfairness. *See Reddick v. State Commissioner of Personnel,* 213 Md. 195, 200, 131 A.2d 464 (1956). Those considerations will require factual determinations, which can best be made by the trial court, as it is authorized to do under the Administrative Procedure Act, Md.Code Ann., Art. 41, § 255(e), where there are allegations of irregularities in procedure that are not shown in the record. We shall remand, pursuant to Md.Rule 1071, for that purpose.

JUDGMENT VACATED PURSUANT TO MD.RULE 1071.

CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.

LOWE, Judge, dissenting.

I am troubled that we are imposing upon "the other" learned profession scruples endemic to our own. Our depiction of the witness tampering or attempted obstruction of justice as "outrageous" was a natural legal knee-jerk reaction. To a profession founded upon principles of justice the conduct *is* "outrageous"; even to society generally, conduct of similar character in the seventies was seen as sufficiently reprehensible to have warranted a presidential resignation. But is it peculiarly relevant to "a physician in his practice as a physician?"

Dr. McDonnell was not *charged* with immoral conduct constituting the crime applicable alike to president or pauper; nor was he charged with immoral conduct in violation of the ethics of the legal profession. He was reprimanded for "immoral conduct of a physician in his practice as a physician." To permit our "knee-jerk reaction" to carry over upon review of this administrative reprimand, exhibits a professional bias that judges of all people must strain to avoid permitting to color our judgment.

Because words are the tools of our profession (like potions those of a doctor) it was not improper for the majority to support the Commission's ruling by defining immorality as proscribed by the statute from *Black's Law Dictionary*. But it is incongruous I think, then abruptly to reverse course seeking solace from the medical expertise of the nine physician colleagues on the Commission to determine the scope of its own jurisdiction by holding that an intentional interference of the judicial process after consultation with counsel, was conducted "in his practice as a physician."

We define "mortality" from our perspective but rely upon doctors for statutory interpretation. Statutory interpretation involving legislative intent is our responsibility, not that of a commission of medical specialists. Whether the nine doctors on the Commission consider an interference with the judicial process by Dr. McDonnell as conduct "in his practice as a physician" over which they have jurisdiction is of no consequence. We are to be concerned only with what the Legislature intended and the Legislature recently clarified the jurisdictional limitations it intended by rephrasing that particular discipline.

When it revised its language to condemn immoral conduct "in the practice of medicine" the restrictive purpose of the third discipline should have become abundantly clear—if not to medical practitioners on the Commission—certainly to those of us supposedly versed in statutory analysis. We know from the Revisor's Note that no substantive change was intended by substituting the new language "in the

practice of medicine" for that under which Dr. McDonnell was tried, "in his practice as a physician". See Revisor's Note following § 14–504. That new more restrictive language if not intended as substantive but clarifying only, was clearly intended to avoid precisely the interpretation that was given by the Commission and this Court. The Legislature could hardly have made it clearer that the only immoral conduct for which a doctor could be held accountable by his colleagues under the "Health Occupations" Code was that committed in the practice of medicine or as previously phrased by "a physician in his practice as a physician". Even judges would have found it difficult to come up with more restrictive language to indicate the limited narrow jurisdiction intended to be bestowed upon the Medical Discipline Commission.

One need not be clairvoyant to see that the Legislature intended no greater demands upon doctors in their social intercourse or even in their enforced judicial encounters, than upon anyone else by imposing that discipline upon them as practitioners of medicine, even before the semantic clarification. The punishment of the immoral conduct prescribed was left to the judgment of medical peers, because the immoral conduct within "the practice of medicine" had nuances not necessarily familiar to laymen, lawyers or even judges. It is within that special field of endeavor—"the practice of medicine"—that called for the expertise and judgment of a commission of colleagues.

It is simply not relevant that Dr. McDonnell's conduct may have violated the law. If such it did, he was subject to prosecution as anyone else would have been. Significantly, in my reading of the statute, he could only have been reprimanded by his peers in that cause if he had been convicted by a criminal court. Md.Health Occ.Code Ann., § 14–504(6) expressly provides:

> "Subject to the hearing provisions of § 14–505 of this subtitle, the Commission on the affirmative vote of a majority of its full authorized membership, may repri-

mand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:

.     .     .     .     .

(6) Is convicted of or pleads guilty or nolo contendere with respect to a crime involving moral turpitude, whether or not any appeal or other proceeding is pending to have the conviction or plea set aside;".

When read in context with the other disciplines, it is clear that if the Legislature had intended subsection (3)[1] to have been so broadly interpreted, subsection (6) would have been unnecessarily redundant and consequently superfluous. And yet, I cannot fault the indignation felt by the majority, however, in light of the Doctor's attempt to intimidate witnesses. I can even understand how the Doctor's colleagues on the Commission would wish to disassociate their profession from such conduct—after it had been publicized—even by so mild a sanction. There is some irony, if not a message, in the fact that before proceeding with his plan, the doctor sought the advice of an attorney—rather than another physician. Despite the fact that the obloquy fell upon the Doctor and not a suggestion of criticism upon his counsel, I am even more convinced that the Doctor's breach was of the general moral concepts of society as enforced by the legal profession, not merely or particularly of other physicians. If the breach were indigenous to either profession it clearly was ours, but a breach of our Code of Professional Responsibility does not violate a medical discipline nor warrant a medical reprimand. The legal sensitivity in *our* concept of professional right and wrong, commanding the maintenance of the integrity of the judicial system I believe, causes my colleagues to err in binding physician intruders to our ethical standards, rather than leaving them to the law generally that is our professional altar. The sanctions imposed should have been those of the society it offended or none at all.

---

1. "(3) Is guilty of immoral conduct in the practice of medicine;".

To salve the retributive conscience of my brethren (and that of the Doctors as well) I suggest reflection upon the consequences of our having published and denounced his "outrageous" conduct in *Meyer v. McDonnell,* 40 Md.App. 524, 392 A.2d 1129 (1978). We reversed his successful defense upon the multi-million dollar attack upon his assets and reputation instructing that the outrage could be considered in determining the standard of his previous care of a medical patient. With that incongruous legal burden he chose to settle the case previously won at a pecuniary cost to which we are not privy.

The price to his reputation is more readily perceptible. Few, if any, of his peers, professional or social, could claim the distinction of having had the second highest court in the State publicly "ravel out" their "weaved-up folly".

But even that published embarrassment was not to be the end. His peers, perhaps chagrined at the exposure of a perceived professional "conspiracy of silence", were able to disassociate medicine from his immorality but could not in conscience smite him too hard for what he had done. Rather they "reprimanded" him professionally which ironically may have circumvented more appropriate societal sanctions.

Perhaps because he too felt that the *source* of this wrist-slap was not justified in rendering its judgment, or even if an amoral attitude still fails to perceive an impropriety, that de minimis sanction became his heaviest burden. Again the spontaneity of his judgment will cost him more than he could have gained. Again he ravels out his "weaved-up folly" by causing to be published a second "record of his offences", that any of his peers who missed the first version may read another "lecture" of them.[2] If the distinction readily recognized even by legal novitiates—between warn-

---

2. "Must I do so? And must I ravel out
My weaved-up folly ...
If thy offences were upon record,
Would it not shame thee in so fair a troop
To read a lecture of them?"
W. Shakespeare, *Richard The Second.*

ing questionable witnesses of the consequences of perjury and implicitly threatening them professionally through prestigious peers—was at one time lost upon this seasoned medical man, he should certainly recognize it now. The price of his education in legal morality, has not been cheap by any standard, and had the charge been made before an appropriate tribunal it may well have been far greater. The fact remains that the conduct condemned was not contemplated as a subject of the restricted jurisdiction of the Commission of Medical Discipline of Maryland.

Because I too deeply resent improper intrusions in the judicial process, I am reluctant to affirm the trial judge's exoneration of the intruder. Because we must protect as sacred ground upon which he trod I cannot condone an improper use of the process even to effect a just result. Our system has sanctions and our process has procedures equipped to cope with conduct intended to distort the judicial process. When we permit the Commission's act of publicly washing its hands to serve as a substantive sanction for what the judicial process had failed to do, it is a disservice demeaning to both. I must respectfully dissent.