**Jeffrey L. CAIN, M.D., Appellant–Defendant,**

v.

**Richard BACK and Suzette Back, Appellees–Plaintiffs.**

**No. 20A03–0705–CV–225.**

Court of Appeals of Indiana.

July 21, 2008.

---

Michael E. O'Neill, Richard P. Girzadas, Hinshaw & Culbertson LLP, Schererville, IN, Attorneys for Appellant.

Mary A. Findling, Findling Garau Germano & Pennington, Laura J. Conyers, Mitchell Hurst Jacobs & Dick, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Following a jury trial, Dr. Jeffrey Cain, M.D., appeals the trial court's judgment awarding Richard and Suzette Back $800,000 in damages on their claim of medical malpractice relating to the stillbirth of their daughter, C.B. On appeal, Dr. Cain raises two issues, which we restate as 1) whether the trial court properly excluded opinion testimony from two treating physicians and 2) whether the trial court properly excluded letters that the Backs' counsel wrote to the same two treating physicians shortly before trial began. Concluding that the trial court did not abuse its discretion in excluding the opinion testimony or the letters, we affirm.[1]

---

1. Because we decide both of the issues on appeal in favor of the Backs, we deny as moot

*Facts and Procedural History*

At approximately 9:00 p.m. on March 1, 2000, Suzette, who was twenty-nine and one-half weeks pregnant with C.B., was admitted to Elkhart General Hospital on complaints of abdominal cramping and decreased fetal movement. Dr. Martina McGowan, M.D., of Westside Obstetrics and Gynecology, P.C., was Suzette's physician, but Dr. Cain, also with Westside Obstetrics, was on call that evening. At approximately 10:00 p.m., Suzette was hooked up to a fetal heart rate monitor, and nurses began monitoring her condition and reporting their observations to Dr. Cain, who was at his home. At approximately 10:30 p.m., Dr. Cain instructed one of the nurses to request that Dr. Starla Graber, M.D., review the readings from the fetal heart monitor. Dr. Graber observed that C.B.'s heart rate was between 130 and 140 beats per minute, which was normal for a fetus of that age, and reported this observation to Dr. Cain.

Approximately one hour later, Dr. Cain instructed the attending nurses to admit Suzette for overnight observation. C.B.'s heart rate remained unchanged for the next two hours, but by approximately 1:30 a.m., the attending nurses reported to Dr. Cain that C.B.'s heart rate dropped to 110 to 120 beats per minute. Upon receiving this information, Dr. Cain went to Elkhart General and conducted an ultrasound at approximately 1:45 a.m. During the ultrasound, Dr. Cain observed chronic oligohydraminios (i.e. low amniotic fluid) and a possible defect in C.B.'s abdominal wall. Based on these observations and on C.B.'s premature gestational age, Dr. Cain decided to transfer Suzette and C.B. in utero to South Bend Memorial Hospital, which was approximately fifteen miles away, because its staff and facilities could provide better care for C.B.

At 2:08 a.m., Dr. Cain contacted Dr. Maria Evangelista, M.D., at South Bend Memorial and requested transfer of Suzette and C.B. for further evaluation, explaining that C.B. had a low fetal heart rate and a possible abdominal wall defect. Based on this explanation, Dr. Evangelista agreed to the transfer. At approximately 2:20 a.m., Dr. Cain conducted another ultrasound, this time with Dr. Graber's assistance. Dr. Graber also observed oligohydraminios, but was not convinced C.B. had a possible abdominal wall defect because the low level of amniotic fluid made it difficult to see the ultrasound images. Nevertheless, based on the ultrasound and on C.B.'s premature gestational age, Dr. Graber agreed with Dr. Cain's decision to transfer Suzette and C.B. in utero to South Bend Memorial. At 2:27 a.m., Dr. Cain ordered the transfer.

From approximately 1:30 a.m. to 3:00 a.m., the point at which Suzette was unhooked from the fetal heart monitor, C.B.'s heart rate mostly remained between 110 and 120 beats per minute, but occasionally dropped to 90 beats per minute. Suzette departed for South Bend Memorial at 3:14 a.m., and C.B.'s heart stopped at some point during the trip. Dr. Evangelista induced labor shortly after Suzette and C.B. arrived, and Suzette delivered C.B. stillborn at approximately 11:50 a.m. on March 3, 2000. An autopsy concluded that the cause of death was "[i]ntrauterine fetal demise" and that "the death may have been related to placental abruption." Defendant's Exhibit E at 6. This latter observation was consistent with Dr. Evangelista's observations during and after delivery of C.B.

On August 1, 2001, the Backs filed a proposed complaint with the Indiana De-

their motion to strike portions of Dr. Cain's appendix and appellate brief.

partment of Insurance against Dr. Cain, Westside Obstetrics, and Elkhart General, alleging they suffered damages as a result of C.B.'s wrongful death. On May 3, 2004, the medical review panel concluded that the evidence did not support a conclusion that Elkhart General failed to meet the appropriate standard of care, but did support such a conclusion with respect to Dr. Cain and Westside Obstetrics. The medical review panel also concluded that "[t]he conduct complained of in the complaint was a factor of the resultant damages." Appellant's Appendix at 109. On June 17, 2004, the Backs filed an amended complaint in Elkhart Circuit Court against Dr. Cain, Westside Obstetrics, and Elkhart General, alleging that Dr. Cain's malpractice resulted in C.B.'s death and that their damages included emotional distress and loss of C.B.'s love and companionship.

From April 9 to 13, 2007, the trial court presided over a jury trial. The Backs proceeded against Dr. Cain and Westside Obstetrics, having previously dismissed Elkhart General, but also dismissed Westside Obstetrics before closing arguments. The Backs' theory of the case was that, based on C.B.'s low heart rate and the low level of amniotic fluid, Dr. Cain should have decided to perform a cesarean section around 2:00 a.m. and that his failure to do so constituted a breach of the standard of care. To prove this breach, the Backs presented testimony from Dr. Stanley Berry, M.D., a hired expert, and Dr. Joseph Geyer, M.D., a member of the medical review panel, both of whom testified to the effect that a reasonably prudent physician under the same circumstances as Dr. Cain would have decided to perform a cesarean section around 2:00 a.m. The Backs' evidence also included testimony from Dr.

Evangelista, who testified to some of the events described above.

During his case-in-chief, Dr. Cain presented testimony from Dr. Stephen Coats, M.D., a hired expert, and introduced the video deposition of Dr. Judson Brewer, M.D., another member of the medical review panel. Dr. Brewer had recanted his conclusion that Dr. Cain and Westside Obstetrics failed to meet the appropriate standard of care after reviewing the deposition testimony of Drs. Evangelista and Graber,[2] and both he and Dr. Coats testified to the effect that Dr. Cain's decision to transfer Suzette and C.B. in utero to South Bend Memorial was a reasonable decision under the circumstances. Dr. Cain also presented testimony from himself and from Dr. Graber, both of whom testified to some of the events described above.

On April 13, 2007, the jury returned a verdict in favor of the Backs and awarded damages in the amount of $800,000. On the same day, the trial court entered judgment on the verdict. Dr. Cain now appeals.

*Discussion and Decision*

### I. Standard of Review

■ The decision to admit or exclude evidence is within the trial court's discretion, and this court reviews the trial court's decision for an abuse of discretion. *Lachenman v. Stice,* 838 N.E.2d 451, 464 (Ind.Ct.App.2005), *trans. denied.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual deductions to be drawn therefrom. *Wallace v. Meadow Acres Mfrd. Hous., Inc.,* 730 N.E.2d 809, 812 (Ind.Ct.App. 2000), *trans. denied.* However, even if the

2. The third member of the medical review panel, Dr. Thomas Wisler, M.D., did not testify at trial.

trial court abused its discretion in excluding evidence, this court will not order a new trial unless the exclusion affects the party's substantial rights. Ind. Evidence Rule 103(a); *Finucane v. Union Planters Bank, N.A.,* 732 N.E.2d 175, 178 (Ind.Ct. App.2000).

## II. Exclusion of Opinion Testimony of Drs. Evangelista and Graber

■ Dr. Cain argues the trial court improperly excluded opinion testimony from Drs. Evangelista and Graber. Resolution of Dr. Cain's argument requires that we address the contours of Indiana Evidence Rules 701 and 702, which pertain to the admissibility of lay and expert opinion testimony, respectively.[3] Indiana Evidence Rule 701 states:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Indiana Evidence Rule 702(a) states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There are two principal distinctions between lay opinion testimony under Rule 701 and expert opinion testimony under Rule 702. First, Rule 701 requires that the opinion testimony be based on the perception of the witness, while Rule 702 does not. *See* Ind. Evidence Rule 703 (explaining that expert opinion testimony under Rule 702 may be based on facts or data "perceived by or made known to the expert at or before the hearing"); 13 Robert Lowell Miller, Jr., *Indiana Practice, Indiana Evidence* § 703.101, at 548 (3d ed.2007) ("Rule 701 requires that opinion testimony be based on the witness's personal perception. Rule 703 eliminates the requirement of personal perception for witnesses offering expert testimony within the meaning of Rule 702."). Second, lay opinion testimony under Rule 701 is not subject to pretrial disclosure requirements, while expert opinion testimony under Rule 702 is. *See* Ind. Trial Rule 26(B)(4)(a) ("A party may ... require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to

---

**3.** For purposes of clarity, we will use the term "lay opinion testimony" to describe opinion testimony under Rule 701, and the term "expert opinion testimony" to describe opinion testimony under Rule 702. In using these terms, we avoid reference to "skilled witness testimony," a term which both our supreme court and this court have used to describe a category of witnesses who lack sufficient knowledge to be qualified as an expert under Rule 702(b), but nevertheless possess more knowledge than is typical of a lay witness. *See, e.g., Kubsch v. State,* 784 N.E.2d 905, 922 (Ind.2003); *Linton v. Davis,* 887 N.E.2d 960, 975 (Ind.Ct.App.2008); *Farrell v. Littell,* 790

N.E.2d 612, 617 (Ind.Ct.App.2003). Although reference to skilled witness testimony presumably is helpful in cases employing the term, its use here is not because we assume Drs. Evangelista and Graber could have qualified as expert witnesses under Rule 702(b), but neither party sought to qualify either of them as such. Thus, it is inaccurate to describe Drs. Evangelista and Graber as witnesses with "a degree of knowledge short of that sufficient to be declared an expert under ... Rule 702, but beyond that possessed by the ordinary jurors." *Kubsch,* 784 N.E.2d at 922 (quotation marks and citation omitted).

testify and a summary of the grounds for each opinion"). These distinctions indicate that a witness who is otherwise qualified to give opinion testimony under Rule 702, but was prevented from doing so based on a lack of pretrial disclosures, may nevertheless give such opinion testimony under Rule 701 if the opinion testimony is based on the witness's personal perception. *See* Miller, *supra,* § 701.104, at 408 ("[I]f a party failed to identify a witness as an expert in response to a discovery request, the witness still might be permitted to state an opinion under Rule 701 based on personal perception, because the admissibility of such testimony does not turn on the witness's ability to satisfy the requirements of Rule 702 for expert testimony."); *cf.* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 701.03[4][b], at 701–33 n. 43 (Joseph M. McLaughlin, ed., Matthew Bender 4th ed.2008) (citing cases where witness gave lay opinion testimony under Rule 701, but also may have been qualified to give expert opinion testimony under Rule 702).[4] With these observations in mind, we turn first to the specifics of Dr. Evangelista's testimony.

During cross-examination of Dr. Evangelista, counsel for Dr. Cain asked whether Dr. Cain's decision to transfer Suzette and C.B. in utero to South Bend Memorial was a "reasonable and appropriate decision" under the circumstances, tr. at 407–08, to which counsel for the Backs objected on the grounds that the question called for Rule 702 opinion testimony and that Dr. Evangelista had not been disclosed as a Rule 702 expert witness. In response, Dr. Cain argued that the question did not call for expert opinion testimony under Rule 702, but merely for lay opinion testimony

under Rule 701 because Dr. Evangelista would be testifying "based on her perceptions." *Id.* at 416. The trial court sustained the objection, and Dr. Cain made the following offer of proof:

If permitted Dr. Evangelista would have testified that number one, based on her review of the records and fetal heart monitor strips from Elkhart General Hospital and [South Bend] Memorial Hospital, her personal experience and her perceptions at the time of treatment[,] Dr. Cain exercised reasonable and appropriate judgment in deciding to transfer the patient to South Bend Memorial rather than performing a c-section at Elkhart General Hospital.

Number two, Dr. Evangelista would have testified that she agreed and still agrees that she would have accepted transfer of the patient on March 2, 2003.

Number three, that the placental abruption that resulted in the demise of the infant was an unpredictable and unforeseeable event.

Number four, that transfer in this case given the circumstances was reasonable and appropriate under these circumstances.

Number five, Dr. Cain did not breach the standard of care.

Number six, Dr. Cain's conduct was not—or did not cause the death of this infant.

Number seven, Dr. Cain's monitoring of the patient was reasonable and appropriate.

Number eight, Dr. Cain's assessment of health—or the health of the mom and the baby was reasonable and appropriate.

---

4. Federal Rule of Evidence 701 now contains an additional requirement that the testimony "not be based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Prior to 2000, however, Indiana Rule 701 and Federal Rule 701 were identical. *See Gibson v. State,* 709 N.E.2d 11, 15 (Ind.Ct.App.1999), *trans. denied.*

And number nine, Dr. Cain's judgment and decision to transfer this patient to—to South Bend Memorial Hospital was reasonable and appropriate.

And finally, number ten, based on a request by plaintiffs' counsel to review the fetal heart strips for signs of fetal distress, Dr. Evangelista would have testified that she found no such evidence.

*Id.* at 898–99. Dr. Cain argues the trial court abused its discretion in excluding this opinion testimony because it meets the two requirements of Rule 701, as the testimony is based on Dr. Evangelista's perceptions and is helpful to either a clear understanding of her testimony or determination of a fact in issue. The Backs counter that Dr. Evangelista's lay opinion testimony under Rule 701 was properly limited to her opinions that were based on information Dr. Cain provided to her during the 2:08 a.m. telephone conversation because the information from that conversation was "all she knew or perceived at the time." Appellees' Brief at 19.[5]

We note initially that Dr. Evangelista's testimony addressed the third, sixth, and tenth offers of proof. *See* Tr. at 397 ("Q So [Dr. Cain] could not have predicted [the placental abruption]? A He could not have predicted that from what he was looking at."); *id.* at 407 ("Q You'd agree, Doctor, when you looked at these strips [ (i.e. the readings from the fetal heart monitor) ] . . . that there was [not] any way to predict that this baby was going to die in the next 30 or 60 minutes or even two hours, was there? A At the time, the baby was alive. You could not predict. Q You could not have predicted the fetal demise? A No."). We interpret Dr. Cain's second offer of proof not to mean that Dr. Evangelista would have testified she agreed to the transfer (that fact was not disputed), but that she would have agreed to the transfer even if Dr. Cain provided her with all relevant information concerning C.B.'s condition (recall that when Dr. Cain contacted Dr. Evangelista, he told her only that C.B. had a low fetal heart rate and a possible abdominal wall defect), thus permitting an inference that Dr. Evangelista was of the opinion that Dr. Cain's decision was reasonable under the circumstances. Such testimony, however, assumes that the predicate question is premised on a hypothetical (e.g. "If Dr. Cain had provided you with all the information about C.B.'s condition, would you still have agreed to the transfer?"), and Rule 701 opinion testimony cannot be based on hypothetical questions.[6] *See* Miller, *supra*, § 701.105, at 408 ("Qualification under Rule 702 (and hence designation as an expert) is only required if the witness's opinion is based on information received from . . . a hypothetical question.").

---

5. We note that even if opinion testimony meets both of Rule 701's requirements, the testimony also must satisfy the balancing test of Indiana Evidence Rule 403 to be admissible. *See Ackles v. Hartford Underwriters Ins. Corp.*, 699 N.E.2d 740, 743 (Ind.Ct.App.1998), *trans. denied.* However, because the Backs limit their arguments regarding the admissibility of Drs. Evangelista's and Graber's testimony to Rule 701, we will assume such testimony meets Rule 403's balancing test.

6. Dr. Cain also argues for the first time in his reply brief that the trial court improperly excluded this testimony because it was relevant to rebut an inference the Backs were inviting the jury to draw throughout trial, namely, that Dr. Evangelista would not have agreed to the transfer if Dr. Cain had provided her with all the relevant information concerning C.B.'s condition. *See* Appellant's Reply Brief at 11–13. However, because a party may not raise an argument for the first time in a reply brief, Ind. Appellate Rule 46(C); *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind.2005), Dr. Cain has waived this argument.

The remaining offers of proof are to the effect that Dr. Evangelista would have testified that Dr. Cain's actions were reasonable under the circumstances—in other words, that he did not breach the standard of care. Implicit in such testimony is that Dr. Evangelista knows the applicable standard of care. Knowledge of the applicable standard of care, however, is not rationally based on Dr. Evangelista's perceptions during her delivery of C.B., it is based on expert knowledge she has obtained as a physician. Cf. *Patel v. Gayes*, 984 F.2d 214, 217–18 (7th Cir.1993) (concluding the district court properly excluded opinion testimony regarding the applicable standard of care from two treating physicians who had not been disclosed as experts because "opinion of the general medical standard of care within the community . . . is 'classic' expert testimony"), *superceded by rule on other grounds as recognized in, Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 n. 2 (7th Cir.2004). Thus, we conclude the trial court was within its discretion when it excluded Dr. Evangelista's opinion testimony.

Dr. Cain's offer of proof regarding Dr. Graber's testimony was substantially similar, though less extensive, than his offer of proof regarding Dr. Evangelista's testimony:

This is a[n] offer of proof regarding Dr. Starla Graber. If permitted to testify, Dr. Graber would have testified as follows:

Number one, Dr. Cain complied with the standard of care in his evaluation of Mrs. Back, and in his decision to transfer the patient to South Bend Memorial.

Number two, nothing Dr. Cain did or failed to do caused or contributed to the death of the infant.

Number three, the demise of the infant during transfer from Elkhart General to South Bend Memorial was not predictable or foreseeable.

Number four, Dr. Graber would have stated that she believes Dr. Cain's decisions were reasonable and appropriate under these circumstances.

Tr. at 902. The first and fourth offers of proof are to the effect that Dr. Cain did not breach the standard of care, and our observations above with respect to Dr. Evangelista's proposed testimony on this subject apply equally to Dr. Graber's proposed testimony. Similarly, Dr. Evangelista's testimony addressed the second and third offers of proof, and Dr. Cain has not explained how preventing Dr. Graber's cumulative testimony on these points amounts to error. Thus, we conclude the trial court was within its discretion when it excluded Dr. Graber's testimony.

We also emphasize that even if the trial court improperly excluded this testimony, the error would have been harmless. Other witnesses, including Dr. Cain, Dr. Coats (Dr. Cain's hired expert), and Dr. Brewer (a member of the medical review panel), addressed the points contained in the offers of proof, testifying to the effect that Dr. Cain did not breach the applicable standard of care and that even if he did, such breach did not cause or contribute to C.B.'s death. *See Meade v. Levett,* 671 N.E.2d 1172, 1178 (Ind.Ct.App.1996) (stating that reversible error cannot be based on improperly excluded evidence that is cumulative of evidence that was properly admitted). Thus, it follows that even if the trial court improperly excluded the testimony of Drs. Evangelista and Graber, any resulting prejudice did not affect Dr. Cain's substantial rights.

### III. Exclusion of Letters from the Backs' Counsel to Drs. Evangelista and Graber

■ Dr. Cain argues the trial court improperly excluded letters the Backs' coun-

sel wrote to Drs. Evangelista and Graber on March 5, 2007, just over one month before the first day of trial. The bodies of the letters are identical:

It has come to my attention that the defendants intend to call you as a witness in their case in chief. I would note, that this is somewhat unusual in that as a treating physician and a patient/physician relationship, you are not authorized to testify adversely to Mrs. Back's positions. That includes being involuntarily conscripted as an expert witness or any other type witness [sic] whose opinion might be contrary to the positions being taken by Mrs. Back in this litigation.

I am sure that [counsel for Dr. Cain] has not contacted you directly about your trial testimony, etc., but I wanted to reaffirm your relationship with Mrs. Back and that such relationship includes a strict prohibition of discussing her matter outside the presence of her counsel. If any efforts are made to discuss your trial testimony, please call my office immediately so that appropriate sanctions can be put in place. Once again, I note the peculiar nature of your testimony on behalf of the defendants, but again remind you of your relationship to Mrs. Back and the quintessential element of such relationship being the trust each of you share with the other. Obviously, any expert testimony that is unnecessary in describing your care in this case which is adverse to Mrs. Back will be considered a breach of that relationship of trust.

Appellant's App. at 141 (letter to Dr. Graber), 166 (letter to Dr. Evangelista). Dr. Graber received the letter, but Dr. Evangelista did not. Instead, Dr. Evangelista's counsel received the letter and did not forward it to her.

On April 2, 2007, Dr. Cain filed a motion arguing that the letters were an improper attempt to influence the testimony of Drs. Evangelista and Graber. Dr. Cain proposed as a remedy that the trial court inform Dr. Graber that the letter was improper and that "she will not face legal jeopardy by testifying at trial," and further argued that the trial court admit the letters as substantive evidence that the Backs and their counsel were aware of the weakness of their case. *Id.* at 140. The trial court heard argument on the motion twice—immediately prior to both Dr. Evangelista's testimony on April 10, 2007, and Dr. Graber's testimony the following day—and, as the following exchange indicates, apparently took the view that the letters would not be admitted into evidence because there was no indication they intimidated Drs. Evangelista and Graber or otherwise prevented them from testifying truthfully:

[Counsel for Dr. Cain]: I'd like the Court to, as I requested in my motion, have a discussion with [Dr. Graber] on the record indicating and advising her that—that the letter was inappropriate. Should not have been sent.

[Trial Court]: Well, I'm not getting in that game, but if you'll bring her in here I will talk with her.

(The witness entered the courtroom.)

[Trial Court]: Why don't you come on up here, right here. You're Dr. Graber, correct?

[Dr. Graber]: Yes.

[Trial Court]: And you've been called as a witness in this action Back versus Cain. Correct?

[Dr. Graber]: Yes.

[Trial Court]: Now, it's my understanding that you received a letter from one or the other counsel that is of some concern to you. When you come in here to give your testimony, I'm going to put you under oath, and have you swear to tell the truth, the whole truth, and noth-

ing but the truth, so help you God. Once you have taken that oath, we will expect that you will tell the truth whatever occurred. Understood?

[Dr. Graber]: Yes.

[Trial Court]: Does that work for you?

[Dr. Graber]: Yes.

[Trial Court]: Got any problems?

[Dr. Graber]: No.

[Trial Court]: Good. I don't either. You might as well just have a seat up here. Now, are we ready to go?

[Counsel for Dr. Cain]: Yes, your Honor.

Tr. at 608. By focusing on whether the letter prevented Dr. Graber from testifying truthfully (we reiterate that Dr. Evangelista never received the letter, and therefore there was no concern that it would impact her testimony), the trial court overlooked the other purpose for which Dr. Cain sought to admit the letters into evidence, namely, as substantive evidence that the Backs and their counsel were aware of the weakness of their case. Despite the trial court's failure to address this issue, we will address whether the letters were properly excluded under the general rules governing the admissibility of evidence, Indiana Evidence Rules 401 to 403.

Rule 402 states that "[a]ll relevant evidence is admissible, except as otherwise provided ... by these rules...." " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403.

On the probative value side of Rule 403's balancing test, Dr. Cain argues that because the letters constitute attempts to improperly influence the testimony of Drs. Evangelista and Graber, they are highly probative of the Backs' and their counsel's awareness of the weakness of their case. To support this argument, Dr. Cain relies on *Meyer v. McDonnell*, 40 Md.App. 524, 392 A.2d 1129 (1978) and *McCool v. Gehret*, 657 A.2d 269 (Del.1995).

In *Meyer*, two expert witnesses were scheduled to testify against the defendant-physician in a medical malpractice trial. The defendant-physician contacted mentors of the experts and instructed the mentors to communicate intimidating messages to the experts. Specifically, the *Meyer* court characterized the intimidating message to the first expert as prefaced with "this is not a threat, but," followed by an admonishment to tread lightly when testifying, 40 Md.App. at 526, 392 A.2d at 1130, and the intimidating message to the second expert as containing an implicit threat that the witness would be "blackballed" if his testimony was unfavorable to the defendant-physician, *id.* at 528, 392 A.2d at 1131. The trial court found that with respect to the first expert witness, the message was "clearly intimidating and intended by [the defendant-physician] to be so" *id.* at 526, 392 A.2d at 1130, and instructed the jury that although it could use the messages to infer that the testimony of the expert witnesses would have been unfavorable to the defendant-physician, such evidence "does not amount to substantive proof and it can't take the place of proof of a fact necessary to the other party's case." *Id.* at 528, 392 A.2d at 1131. In concluding the trial court committed reversible error in giving this instruction, the court held that evidence of witness intimidation

is admissible as tending to show [the defendant-physician's] consciousness of the weakness of his case and a belief that his defense would not prevail without the aid of such improper and unfair tactics as those in which he engaged. This, in conjunction with the other evidence in the case, may lead to the further inference that appellee considers his case to be weak because he, in fact, is guilty of the negligence which appellant asserts he committed. Such inferences are, of course, merely permissible and the jury is free to either accept or reject them as it sees fit.

*Id.* at 533, 392 A.2d at 1133.

The *McCool* court reached the same result under substantially similar circumstances. In *McCool,* the plaintiff's treating physician was scheduled to testify as an expert witness in a medical malpractice trial. The defendant-physician contacted one of the expert's colleagues, who twice relayed the defendant-physician's message "that it was inappropriate for doctors to testify against doctors." 657 A.2d at 273. The expert thought the messages were "intended to coerce or intimidate him into not testifying," *id.,* but the trial court excluded them from evidence, concluding that although the defendant physician's conduct was "reprehensible," *id.* at 276, the probative value of the messages were substantially outweighed by the danger of unfair prejudice, *see id.* (citing Del. Evidence Rule 403). In concluding the trial court's exclusion of the messages constituted reversible error, the court relied heavily on the *Meyer* opinion:

> Thus, a party's efforts to interfere with a witness are not simply admissible as impeachment evidence of the tampering party's credibility. *Meyer v. McDonnell,* 392 A.2d at 1134. The opposing party is entitled to introduce facts regarding efforts to intimidate a

witness as *substantive evidence.* Although such evidence may not be sufficient to establish a *prima facie* case, it has probative value with respect to the tampering party's consciousness of the weakness of his or her position on the merits and may be considered by the jury for that purpose. *Accord Meyer v. McDonnell,* 392 A.2d at 1134. Consequently, from the evidence of interference and the other evidence in this case, the jury could infer that [the defendant-physician] considered his case to be weak because he was, in fact, guilty of the negligence which the plaintiffs alleged. *Meyer v. McDonnell,* 392 A.2d at 1134.

*Id.* at 277 (emphases in original, citation omitted).

Dr. Cain argues the letters to Drs. Evangelista and Graber are "as egregious" as the messages in *Meyer* and *McCool,* appellant's brief at 23, because the letters contain an explicit threat that the doctors are "not authorized to testify adversely to Mrs. Back's positions," appellant's app. at 141, 166, and because the letters contain an implicit threat that adverse testimony may subject the doctors to civil liability, *see* appellant's br. at 20. The Backs acknowledge the letters "may have been inartfully drafted," appellees' br. at 32, but counter that the letters are distinguishable from the messages in *Meyer* and *McCool* because they were not intended to improperly influence the testimony of Drs. Evangelista and Graber, but "to insure that those physicians would not impermissibly talk with Dr. Cain's counsel outside the presence of the Backs' counsel . . . .", *id.* at 31.

The principal problem with Dr. Cain's argument that the letters are indistinguishable from the messages in *Meyer* and *McCool* is that the messages in those cases could be reasonably interpreted only as

attempts to intimidate the witnesses. Indeed, the trial court in *Meyer* found that one of the messages was "clearly intimidating and intended by [the defendant-physician] to be so" *id.* at 526, 392 A.2d at 1130, and the *McCool* court, after noting that the trial court found that the messages were an intentional attempt by the defendant-physician to influence the expert witness's testimony, emphasized that "[t]he condition precedent to admitting evidence of interference with a witness is a demonstration that the acts alleged are attributable to the opposite party and that the acts alleged were done with the intent to interfere," 657 A.2d at 277; *cf. Jensen v. IHC Hosps., Inc.,* 82 P.3d 1076, 1099 (Utah 2003) (recognizing that evidence of a party's wrongdoing may be considered an admission by conduct of liability if the trial court "is satisfied that [the wrongdoing] constitutes a clear and unequivocal expression and is therefore a credible substitute for verbal expression").

Here, the letters do support an inference that the Backs' counsel intended to improperly influence the testimony of Drs. Evangelista and Graber, as they state, "you are not authorized to testify adversely to Mrs. Back's positions." Appellant's App. at 141, 166. An inference of witness intimidation based on this single statement, however, does not necessarily foreclose other reasonable inferences concerning the Backs' counsel's intent, especially when other statements in the letters are considered. In this respect, we note the letters also state that the doctors' relationship with Suzette "includes a strict prohi-

bition of discussing her matter outside the presence of her counsel" and request that the doctors contact the Backs' counsel "[i]f any efforts [by Dr. Cain's counsel] are made to discuss your trial testimony . . . ." *Id.* These statements are consistent with this court's holding in *Cua v. Morrison,* 626 N.E.2d 581, 582 (Ind.Ct.App.1993), *adopted and incorporated by,* 636 N.E.2d 1248, 1249 (Ind.1994), that "ex parte interviews with a party-patient's health-care providers by opponent's counsel impermissibly compromise[ ] the physician-patient privilege." *See also id.* at 585 n. 6 (observing that a patient-plaintiff has "some control" over non-party treating physicians because "the physician is not a neutral witness. He or she owes a preexisting duty of confidentiality to the patient-plaintiff" (quoting Philip H. Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient–Litigant's Right to a Fair Trial,* 21 Loy. U. Chi. L.J. 1001, 1028 (1990))). As such, these statements support a reasonable inference that the Backs' counsel's intent in sending the letters was, as the Backs put it, "to insure that those physicians would not impermissibly talk with Dr. Cain's counsel outside the presence of the Backs' counsel . . . ." Appellees' Br. at 31.[7]

We also note that the passage Dr. Cain relies on as supporting an inference of intent to intimidate—"you are not authorized to testify adversely to Mrs. Back's positions," appellant's app. at 141, 166—is tempered by the subsequent passage re-

---

**7.** Dr. Cain argues that such an inference is illusory because the Backs waived the physician-patient privilege as a matter of law, thus rendering this court's holding in *Cua* inapplicable to the facts of this case. Dr. Cain overlooks that the extent to which a patient-plaintiff waives the physician-patient privilege is not always easy to ascertain. *See Canfield v. Sandock,* 563 N.E.2d 526, 530 (Ind.1990)

(recognizing "that most cases will not lend themselves to such simple resolution" as to the extent of the waiver of the privilege). Thus, by generally prohibiting ex parte interviews, *Cua* avoids the situation where the patient-plaintiff has "no opportunity to exercise the privilege [because] she or her counsel could not be present during the interview." 626 N.E.2d at 584.

minding the doctors that "any expert testimony that is unnecessary in describing your care in this case which is adverse to Mrs. Back will be considered a breach of that relationship of trust," *id.* The distinction here is somewhat subtle, but goes back to our conclusion above that the trial court properly excluded expert opinion testimony of Drs. Evangelista and Graber. *See supra,* Part II. The doctors had not been disclosed as expert witnesses, and therefore were not authorized to testify in that capacity, though it was permissible for them to testify as fact witnesses regarding their personal observations during the course of treating Suzette and C.B. We therefore interpret these passages, recognizing that they are inartfully drafted, as also supporting the reasonable inference that the Backs' counsel intended them as reminders to the doctors that they were not allowed to provide expert opinion testimony. That Dr. Cain subsequently attempted to elicit such testimony through his offer of proof further supports this inference.

The foregoing indicates that the letters are not as unequivocal as Dr. Cain claims as supportive of an inference that the Backs' counsel intent in sending them was to intimidate Drs. Evangelista and Graber, and they are certainly much more equivocal on that point than the messages in *Meyer* and *McCool.* Thus, we conclude the trial court could have concluded the letters' probative value as evidence of witness intimidation was substantially outweighed by the danger of misleading the jury, and it follows that the trial court did not abuse its discretion in excluding the letters as substantive evidence of the Backs' and their counsel's consciousness of the weakness of their case.[8]

### Conclusion

The trial court did not abuse its discretion when it excluded expert testimony

---

8. Although we do not base our decision on it, we note that *Meyer* and *McCool* are distinguishable on two additional grounds. First, the messages in *Meyer* and *McCool* were attributable to a party, whereas in the instant case the letters are attributable to the Backs' counsel. Although counsel may bind a client during in court proceedings, out of court proceedings generally require evidence that the client authorized the conduct, *see Miller v. Ryan,* 706 N.E.2d 244, 251–53 (Ind.Ct.App. 1999) (concluding the trial court erred in instructing the jury that the defendant-physician counsel's wrongful conduct of contacting a member of the medical review panel ex parte could be used as substantive evidence because there was no evidence the defendant-physician authorized such conduct), *trans. denied,* and Dr. Cain apparently concedes that such evidence is lacking, see appellant's reply br. at 7 (stating that the Backs' observation "that 'Dr. Cain points to no evidence of an intentional act *by the Backs* to interfere with any witness's testimony'" is "factually correct") (quoting Appellees' Br. at 37 (emphasis added)).

Second, the holdings of *Meyer* and *McCool* that evidence of witness intimidation may be used as substantive evidence of the party's awareness of the weakness of its case are arguably in tension with *Underwood v. Gale Tschuor Co., Inc.,* 799 N.E.2d 1122, 1133–34 (Ind.Ct.App.2003), *trans. denied.* In *Underwood,* a panel of this court interpreted our supreme court's decision in *Cahoon v. Cummings,* 734 N.E.2d 535, 545 (Ind.2000), as standing for the proposition that even if there is sufficient evidence to permit an instruction on spoliation of evidence, such an instruction cannot support an inference that the party committed the spoliation because it believed it was at fault. *See id.* at 1134. To the extent spoliation of evidence and witness intimidation constitute the same type of wrongdoing (that is, they are both improper attempts to avert the truth-seeking function of litigation), *Underwood* contradicts the holdings of *Meyer* and *McCool.* However, because the parties do not extensively argue these points in their briefs, and because we have already concluded the trial court could have concluded the letters' probative value as evidence of witness intimidation was substantially outweighed by the danger of misleading the jury, we reiterate that we do not base our decision on these points.

from Drs. Evangelista and Graber and when it excluded letters the Backs' counsel wrote to the same doctors.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.