## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Jul 09 2015, 7:44 am
*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

**ATTORNEY FOR APPELLANT**

Michael B. Troemel
Lafayette, Indiana

**ATTORNEYS FOR APPELLEE**

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Miller
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of T.D., A Child Alleged To Be In Need Of Services,

W.D., Father

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 9, 2015

Court of Appeals Case No. 79A02-1411-JC-790

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Cause No. 79D03-1408-JC-237

**Brown, Judge.**

[1] W.D. ("Father") appeals from the trial court's order determining that T.D. is a child in need of services ("CHINS"). Father raises one issue which we revise and restate as whether sufficient evidence supports the court's determination that T.D. is a CHINS. We affirm.

## Facts and Procedural History

[2] S.E. ("Mother") has five children: A.E., age 15, A.L., born September 29, 2008, J.L., born July 22, 2010, L.G., born November 12, 2012, and T.D., born August 21, 2014.[1] Father is the father of T.D. The Department of Child Services ("DCS") took T.D. into protective custody upon her release from the hospital shortly after birth. Along with Mother, Father has been primarily responsible for the care of A.L., J.L., and L.G. for the time period relevant in the CHINS case.

[3] In November 2013, L.G. was seen by a primary care physician for swollen testicles, hair loss, and bruising to his face. The physician was concerned that L.G. may have an upper respiratory condition and advised Mother to take him to the emergency room. However, Mother failed to do so. In January 2014, L.G. was taken to the emergency room "for a red penis . . . with a hair at the tip of the penis and bruising on the penis," and he was "given a diagnosis of hair tourniquet syndrome." Transcript at 25-26. In February 2014, he was seen again by a primary care physician because his penis was red and bruised. That physician

---

[1] Mother does not participate in this appeal. A.E. was not included in the CHINS petition because she was in the third-party custody of her grandmother.

assumed the redness and bruising was caused by another hair tourniquet though there was no description of hair being present at that time.

[4] In May 2014, L.G. fractured his clavicle, and was taken to the hospital by Mother. On June 11, 2014, Mother took him to the emergency room with "cough, fever, and a rash," which was described as a "viral type rash on the trunk of his body" and "petechial rash on his face."[2] *Id.* at 27. He had a normal platelet count at that time and was given a diagnosis of upper respiratory infection and pneumonia. The next day, L.G. was again seen in the emergency room "with head swelling and mushiness to his scalp." *Id.* A skull x-ray revealed some soft tissue swelling on the back of his head, but the physicians "did not do any additional laboratory evaluations at that time." *Id.*

[5] On June 17, 2014, L.G. was taken to the emergency room by Mother for "swelling of his face and his head." *Id.* A physical examination revealed "swelling to the scalp, to his forehead, and to his nasal bridge. He was given a diagnosis of acute scalp swelling," and the physicians conducted a CT scan of his head, which showed scalp swelling and fluid in the scalp along with what was "probably blood." *Id.* at 27-28. On June 19, 2014, at the insistence of DCS, Mother and Father returned L.G. to the emergency room, with two black eyes and severe

---

[2] Dr. Roberta Hibbard testified:

> Petechiae are hemorrhages in the skin. They are small pin point, non-blanching bruises basically on the face that are typically associated with strangulation type injuries or choking types of injuries. They can also be seen in medical conditions where the platelet count is really low. Some types of really horrific coughing as in Pertussis, you might get a few petechiae on the face.

Transcript at 27.

swelling to both of his eyelids. The physicians again noted the appearance of petechiae on his clavicle and chest wall. A skeletal survey and other laboratory evaluations were performed to look for causes of his condition. It was discovered he was anemic, likely due to blood loss, his coagulation studies were normal indicating he did not have any bleeding disorders, and the skeletal survey confirmed that the fracture to his clavicle was healing and also revealed a healing fracture in the forearm on the same side as the clavicle fracture.

[6] Four days after T.D. was born, on August 25, 2014, DCS filed a CHINS petition regarding T.D. based on concerns that Father had abused or failed to provide adequate supervision to A.L., J.L., and L.G. The CHINS petition incorporated DCS's Preliminary Inquiry and Investigation Report, which included allegations that A.L., J.L., and L.G. had been placed in foster care on June 19, 2014 due to concerns of physical abuse against L.G. The petition noted that Mother and Father were the only primary caregivers to the children and while in their care, L.G. had sustained many injuries including a broken collarbone, buckle fracture of the right forearm, head injury resulting in fluid on the brain,[3] bruising on his penis, and a red and swollen scrotum, and explanations for the injuries had been inconsistent. The petition also stated that Mother and Father assigned blame to the other children for causing the injuries, the other children denied injuring L.G. and said that Father choked them, and that "Dr. Hibbard at Riley Children's

---

[3] At the fact finding hearing, Dr. Hibbard clarified that there was no fluid on L.G.'s brain, but that the fluid was between the skin of the scalp and the bone of the skull.

Hospital commented the high number of 'accidental' injuries is concerning and should be investigated." Appellant's Appendix at 21.

[7] The court conducted a fact finding hearing concerning the CHINS petition on September 5 and September 19, 2014. The court heard testimony from Family Case Manager Melissa Haywood, Dr. Hibbard, Mother, Mother's oldest child A.E., and Father. On October 15, 2014, the court entered an order in which it adjudicated T.D. a CHINS.[4] Among numerous other findings, the order states:

5. DCS received a report January 2013 alleging that [L.G.] had bruises on his penis. Investigation confirmed bruising on the penis. However, DCS was unable to determine either the perpetrator or the mechanism of injury. There was at least some indication that one of the other children might have pulled on the penis. Therefore, DCS unsubstantiated that report.

6. DCS received a second report November 2013 that [L.G.] had a red and swollen scrotum. Investigation revealed the scrotum was red and swollen. There was some indication of a potential diagnosis of a hair tourniquet causing such symptoms. DCS unsubstantiated the second report.

7. DCS received a third report May 2014 alleging [L.G.] suffered a fractured collarbone. Investigation confirmed the collarbone was fractured. Mother reported [L.G.] walked in front of another child who was swinging and was kicked. However, during an interview [A.E.] disclosed Mother stated the collarbone was injured at daycare. [A.E.] recanted this statement during testimony stating she "got the story mixed up" and only "assumed" the injury occurred at daycare. At the Fact Finding Hearing, Mother's friend testified that [L.G.] was struck by a swinging child at her daughter's birthday party causing him to be knocked over and sustain a bloody nose.

8. DCS received a fourth report June 2014 alleging [L.G.] suffered a head injury. Investigation confirmed the head injury. Mother's boyfriend, [Father], provided childcare during Mother's weekend employment hours. [Father] stated an older sibling, [J.L.] (age 4) jumped on [L.G.]. A full

---

[4] The court similarly adjudicated A.L., J.L., and L.G. as CHINS in its order.

body scan revealed the healing collarbone. It also revealed a healing buckle fracture in the forearm. Mother was unable to provide any explanation for the fractured forearm except perhaps as the result of the daycare provider picking the child up by the arm a few days after the collarbone injury.

9. The older children, [A.L.] and [J.L.], were interviewed and disclosed that [Father] choked and hit [L.G.]. The children disclosed that [Father] also choked them. The children further disclosed seeing Mother and [Father] engaging in sex. Law enforcement was unable to contact [Father] to conduct an interview.

* * * * *

12. The older children had no signs of injury but were removed due to the younger child's unexplained injuries because, even if Mother did not directly cause the injuries, Mother either failed to supervise and/or failed to protect against injury.

* * * * *

14. Dr. Roberta Hibbard is a pediatric physician specially trained to assess potential child abuse. Although Dr. Hibbard did not physically examine [L.G.], she did review photos of the relevant injuries in addition to his medical records including lab and radiology reports in relation to medical care provided on December 12, May 6, June 11, June 12, June 17, and June 19. Dr. Hibbard also reviewed the Preliminary Inquiry and the proffered explanations for the child's various injuries. Dr. Hibbard had sufficient information upon which to develop an opinion regarding the nature of the child's injuries.

15. In November 2013, [L.G.] was seen by his Primary Care Physician for swollen testicles, bruising on his penis and face, and hair loss. Mother was advised to take [L.G.] to the emergency room and failed to do so.

16. In January 2014, [L.G.] was examined at the emergency room for a red and bruised penis. A medical provider provided a diagnosis of hair tourniquet syndrome. A hair tourniquet acts like a ligature and would result in a sharp line with swelling and discoloration. It would not result in bruising on the tip of the penis.

17. In February 2014, [L.G.] was again seen by his Primary Care Physician for a red and bruised penis.

18. In May 2014, [L.G.] was examined at the emergency room for pain near the collarbone and diagnosed with a clavicle fracture. The proffered explanation of being hit after walking in front of a swinging child is plausible. A fall to the ground on an outstretched arm is a common mechanism for such an injury.

19. On June 11, 2014, [L.G.] was examined at the emergency room for a suspected viral rash resulting in a diagnosis of upper respiratory infection/pneumonia. The suspected viral rash observable on the trunk and face area was actually petechiae commonly associated with choking or strangulation.

* * * * *

22. The injuries on the back of the skull combined with the unexplained swelling and bleeding under the scalp are consistent with an impact to the head. The petechiae component is particularly consistent with the disclosures of choking. Unexplained bruises to the penis are very unusual at this age and repeat injuries to the penis are a "big red flag". Accidental injuries to the penis will generally have a known cause. A hair tourniquet is not consistent with the type of injuries observed on the child's penis. Dr. Hibbard testified that boys with bruised penises often later suffer more severe injuries. There is a reasonable probability the injuries to the child are non-accidental.

23. Mother works full-time approximately forty (40) hours per week between 6:00 AM and 4:00 PM. [Father] provided childcare for the children on alternating weekends during Mother's hours of employment. There were no other caregivers for the children during the relevant time period with the exception of the childcare facility. [Father] denies he did anything to injure [L.G.] intentionally.

24. When questioned during the investigation regarding [Father], Mother reported uncertainty about continuing the relationship suggesting she may return once the DCS case closed. Mother has continued to maintain contact with [Father] throughout the pendency of this case. Mother state [sic] the two are not in a relationship now. Mother testified she considers [Father] a friend who has not done anything to the children except be there for them. Mother asserts she did not see anyone harm the children including [Father].

* * * * *

26. Although Mother sought medical treatment for the child's various injuries, she is unwilling to accept even the possibility that the repetitive injuries without sufficient explanation are the result of non-accidental trauma despite medical evidence to the contrary.

27. Although Mother has cooperated with recommendations for services thus far including a parenting assessment, psychological evaluation, and supervised visitation, it is unlikely Mother would accept services without coercive intervention given her refusal to acknowledge non-accidental harm to the child and her ongoing contact with [Father].

28. IC 31-34-1-1 ("CHINS 1") specifically provides as follows: The children's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the children's parent(s), guardian(s), or custodian(s) to supply the children with necessary food, clothing, shelter, medical care, education, or supervision.

\* \* \* \* \*

30. Pursuant to IC 31-34-12-4, there is a rebuttable presumption that a child is in need of services because of an act or omission of the child's parent, guardian, or custodian if DCS introduces evidence of probative value that (1) the child has been injured, (2) at the time the child was injured, the parent, guardian, or custodian either had the care, custody, or control of the child or had legal responsibility for the care, custody or control of the child, (3) the injury would not ordinarily be sustained except for the act or omission of the parent, guardian, or custodian, and (4) there is a reasonable probability the injury was not accidental. DCS presented such evidence. Mother and [Father] failed to rebut such presumption.

\* \* \* \* \*

34. Although it is uncertain whether Mother herself or [Father] inflicted the injuries to [L.G.], there is no question the child suffered harm while under the care of Mother as a parent or [Father] as a custodian.

35. Mother either failed to supervise the children, failed to protect the children from exposure to injury, or both. The Court is not required to wait until a greater tragedy occurs or until the other children suffer a similar harm before intervening.

Court finds it is in the best interests of the children to be removed from the home because continuation in the home would not be in the best interest of the children and would be contrary to the welfare of the children.

The responsibility for the placement of the children is granted to the Tippecanoe County Department of Child Services.

Court finds the least restrictive placement for the children is continued placement in foster care.

*Id*. at 38-41.

[8] On November 10, 2014, the court held a dispositional hearing and issued its dispositional order for Father, which provides in part that Father must abide by the terms of the Parental Participation Decree, submit to drug and alcohol screens, attend supervised visitations with T.D., and participate in services focusing on personal development and learning about effective and safe methods of discipline including the impact that abuse and domestic violence has upon children. Additionally, the dispositional order confirmed the adjudication of the children as CHINS and ordered their placement in foster care to continue.

## *Discussion*

[9] The issue is whether sufficient evidence supports the trial court's determination that T.D. is a CHINS. When we review the sufficiency of evidence, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. *In re A.H.,* 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). We neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* DCS is required to prove by a preponderance of the evidence that a child is a CHINS. *Id.* When a court's orders contain specific findings of fact and conclusions of law, we engage in a two-tiered review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the

judgment. *Id.* We reverse the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if it is unsupported by the findings and conclusions. *Id.* When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. *Id.*

[10] Ind. Code § 31-34-1-1 governs the CHINS determination as to T.D. and provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>> (2) the child needs care, treatment, or rehabilitation that:
>>> (A) the child is not receiving; and
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute does not require a tragedy to occur before a court may intervene. *In re A.H.,* 913 N.E.2d at 306. "Rather, a child is a CHINS when he or she is endangered by parental action or inaction." *Id.* "The purpose of a CHINS adjudication is not to punish the parents, but to protect the children." *Id.*

[11] Father argues that the evidence is insufficient to sustain the trial court's conclusion that T.D. was a CHINS. Specifically, he contends that the evidence does not support Findings 5, 6, 8, 9, 12, 14, 15, 16, 17, and 34 of the court's order and that the trial court's findings do not support the conclusion that T.D. was seriously

endangered. DCS argues that the unchallenged findings taken apart from the challenged findings support the trial court's conclusions and that the challenged trial court findings are supported by the evidence. DCS concedes that some of Father's arguments concerning the challenged findings have merit, but argues that most of the challenges are simply requests to reweigh the evidence.

[12] To the extent that Father challenges Findings 5, 6, 8, 12, 15, 16, and 17, he does not argue that the injuries described in or underlying those findings did not occur. Instead, Father asserts that the court did not adequately take into account testimony that tends to mitigate Mother and Father's role in the occurrence of the injuries to L.G.

[13] Father challenges Finding 9, and argues that the statements on which it is based were hearsay.[5] However, Father failed to object to the admission of the statements he now challenges. Accordingly, we conclude that Father has waived this issue on appeal. *See Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006) ("In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'" (quoting *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004))).

[14] Father challenges the portion of Finding 14 that asserts Dr. Hibbard had sufficient information to form her opinion and argues that she could not have had sufficient information because she failed to speak with either Mother or Father. Ind.

---

[5] In his brief, Father cites to Finding 10, but refers to the substance of Finding 9.

Evidence Rule 703 provides that an expert witness may base her opinion on "facts or data in the case that the expert has been made aware of or personally observed" and that "[e]xperts may testify to opinions based on inadmissible evidence, provided that it is the type reasonably relied upon by the experts in the field." Dr. Hibbard reviewed the DCS intake report regarding the preliminary investigation, medical records, photographs, and a radiology CD in forming her opinion, all of which are of the type a physician may reasonably rely upon in testifying as an expert witness. Furthermore, a physician acting as an expert witness need not examine the person in question. *See Cain v. Back*, 889 N.E.2d 1253, 1257 (Ind. Ct. App. 2008) ("Rule 703 eliminates the requirement of personal perception for witnesses offering expert testimony . . . ." (quoting 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.101, at 548 (3d ed. 2007))), *trans. denied*. Accordingly, we cannot say the court erred in entering Finding 14.

[15] Father's challenge to Finding 34 is also unpersuasive. The finding is merely that L.G. suffered harm while under the care and supervision of Mother and Father regardless of whether Mother, Father, the siblings, or some other party was responsible for causing the injuries. The finding that L.G. suffered harm while Mother, as parent, and Father, as custodian, were charged with his care and supervision is amply supported by the evidence presented to the trial court.

[16] With respect to the court's conclusion that T.D.'s physical or mental condition is seriously impaired or seriously endangered as a result of the actions or inactions of Mother and Father, the court found that the multiple injuries sustained by L.G. occurred while in the care of Mother and Father, but that it was uncertain whether

Mother and Father had inflicted the injuries themselves. Moreover, the court also found that "Mother either failed to supervise the children, failed to protect the children from exposure to injury, or both." Appellant's Appendix at 41. Based on the record and the findings establishing multiple inadequately explained injuries, we conclude that it is not clearly erroneous for the court to have determined that T.D.'s mental or physical condition was seriously impaired or endangered by Mother and Father's inability, refusal, or neglect to provide the children with necessary supervision, or by Mother and Father's failure to protect them from injury, whether such injury was inflicted by Mother, Father, or another person. *See In re A.H.,* 913 N.E.2d at 306 ("[A] child is a CHINS when he or she is endangered by parental action or inaction.")

[17] Furthermore, we conclude that the findings of the trial court support the conclusion that T.D. needs care, treatment, or rehabilitation that is unlikely to be provided or accepted without the coercive intervention of the court because the court found it to be "unlikely Mother would accept services without coercive intervention given her refusal to acknowledge non-accidental harm to [L.G.] and her ongoing contact with [Father]." Appellant's Appendix at 40. Based upon the record, we conclude that the judgment reached by the court is not clearly erroneous.

## *Conclusion*

[18] For the foregoing reasons, we affirm the trial court's judgment that T.D. is a CHINS.

Affirmed.

Crone, J., and Pyle, J., concur.